## UNITED STATES v. AIUPPA.

### Cr. 20298.

United States District Court
N. D. Ohio, E. D.
Feb. 7, 1952.

Don C. Miller, U. S. Atty., John J. Kane, Jr., First Asst. U. S. Atty., Cleveland, Ohio, for the United States.

William L. Kelly and George F. Callaghan, of Chicago, Ill., and Fred H. Mandel, of Cleveland, Ohio, for defendant Aiuppa.

McNAMEE, District Judge.

Defendant was charged under Section 192 of Title 2 U.S.C.A. with refusing to answer twelve questions put to him as a witness before a Special Committee of the United States Senate at Cleveland, Ohio on January 19, 1951. He waived a jury and submitted the case on its merits to the court. Prior to the trial defendant filed a motion to dismiss the indictment, setting forth twenty specifications of objections. Specifications 17–18 were overruled before trial. Specifications 1 to 3, inclusive, 6 to 10, inclusive, 13 to 16, inclusive, and No. 20, are directed to alleged defects in the form and sufficiency of the indictment. These objections have been considered and found to be without merit.

■ Specifications 11 and 12 are based upon the contention that there was not a quorum of the Committee present at the hearing. This objection comes too late. At the hearing defendant raised no question as to the absence of a quorum, and, as stated in United States v. Bryan, 339 U.S. 323, 332, 70 S.Ct. 724, 731, 94 L.Ed. 884; "* * * the courts need not treat as important that which the witness obviously regarded as unimportant." The issue of the presence of a quorum at the hearing in question was raised and decided in the case of United States v. DiCarlo, D.C., 102 F. Supp. 597. What was there said in that connection is, without repetition, incorporated herein. Defendant concedes that a subcommittee of one was authorized to take testimony, but argues that the one so designated to act was without authority to direct the witness to answer the questions. This argument must be rejected. The power to take testimony necessarily implies the requisite authority to compel a witness to answer pertinent questions. Specifications 11 and 12 of the motion are therefore overruled.

The issue of the pertinency of the questions raised by specification No. 19, and the defendant's asserted justification of his refusals to answer the questions which are set forth in specifications 4 and 5 will be hereinafter discussed.

Defendant is a resident of Cicero, Illinois, and, by arrangement with the Special Committee, was permitted to appear as a witness at the hearing in Cleveland, Ohio. His attitude as a witness was most unusual. In answer to the first two questions put to him he gave his name and address. After the next question was propounded he announced that he stood "on my constitutional rights" and "I will refuse to answer all questions on the ground that it may tend to incriminate me." However, counsel for the Committee proceeded to ask further questions, all of which the witness refused to answer. During the first part of his examination the defendant responded to the questions by expressly stating that he refused to answer on the ground of self-incrimination. After the examination had proceeded for some time the defendant adopted the attitude of remaining completely mute. Thereafter he neither answered the questions, gave any reason for his refusal to answer, or uttered a single word in recognition of the fact that questions were asked of him. Repeatedly, there appear in the transcript such statements as,—"The Chairman: Let the record show to those questions he is remaining mute."—"The Chairman: Again let the record show the witness is mute." After several futile attempts to obtain some expression from the witness the examination was terminated.

The defendant refused to answer such obviously harmless inquiries as, "How old are you?"—"Where were you born?"—"Are you married?" et cetera. These questions are not set forth in the indictment; but the witness's refusal to answer them serves to illustrate his general attitude of calculated contumacy.

At the conclusion of his examination of the defendant the Chairman instructed Mr. Robinson, counsel for the Committee, to make a statement for the record in connection with the pertinency of the questions put to the defendant.

The defendant is not charged generally with a refusal to answer any questions, as

was the case in United States v. Josephson, 2 Cir., 165 F.2d 82. In each of the twelve counts of the indictment he is charged with refusing to answer the specific question therein set forth. It is therefore necessary to determine the pertinency of each question and the validity of defendant's asserted justification for his refusals to answer.

In an opinion filed this day, in the case of United States v. DiCarlo, No. 20299, this court has stated the principles governing the issue of the pertinency of questions—the right of a witness before the Committee to claim immunity against disclosures that would expose him to prosecution under state as well as federal law, and the rules by which the justification of a witness's refusal to answer may be determined. What has been said in the DiCarlo case in respect to these matters is adopted and made a part hereof.

■ On their face, several of the questions put to the defendant seem irrelevant. But reference to the statement of Mr. Robinson, counsel for the Committee, set forth in the record, discloses the relation between many of the questions and the broad purpose of the inquiry as set forth in Senate Resolution 202. The question in count No. 1,—"Does he have a place in Wisconsin?"—is apparently not pertinent. But reference to the statement of Mr. Robinson discloses that the Committee had difficulty in obtaining service upon the defendant and suspected that he was hiding in a lodge owned by him located in Wisconsin. And as counsel for the Committee stated, "I wanted to find out from him who else was possibly hiding out up there with him."

In a somewhat similar situation in Hoffman v. United States, 341 U.S. 479, 488, 71 S.Ct. 814, 819, 95 L.Ed. 1118, the court said: "Also, the court should have recognized, in considering the Weisberg questions, that one person with a police record summoned to testify before a grand jury investigating the rackets might be hiding or helping to hide another person of questionable repute sought as a witness. To be sure, the Government may inquire of witnesses before the grand jury as to the whereabouts of unlocated witnesses; ordinarily the answers to such questions are harmless if not fruitless. But of the seven questions relating to Weisberg (of which three were answered), three were designed to draw information as to petitioner's contacts and connection with the fugitive witness; and the final question, perhaps an afterthought of the prosecutor, inquired of Weisberg's whereabouts at the time. All of them could easily have required answers that would forge links in a chain of facts imperiling petitioner with conviction of a federal crime." The defendant was justified in not answering question No. 1.

■ The question contained in count No. 2 was pertinent and apparently designed to elicit information of a non-incriminatory nature. But again, reference to the statement of counsel for the Committee reveals that an answer to this question might have exposed the defendant to the danger of prosecution under state law. The question in count No. 2 is: "Is he a partner with R. J. Ansone, Claude Maddocks or John 'Screwy' Moore, and Harry Milner, and Ray Johnston in Taylor & Co.?" Taylor & Company was engaged in the manufacture of gambling equipment, such as roulette wheels, dice, and gambling tables. There is no federal or state law making it unlawful to engage in such a business. But counsel for the Committee stated that the purpose of the question was to discover how the defendant acquired an interest in this business,—"whether it was a muscle job or not." "Muscling", as the Committee itself recognized, implies violence, intimidation, bribery, extortion, and worse. An answer to question No. 2, therefore, might have furnished links in the chain of evidence tending to involve the defendant in the commission of serious violations of state law.

The question in count No. 11 also relates to defendant's supposed connection with Taylor & Company and is governed by the same principle.

The alleged question in count No. 3 is a statement of fact requiring no answer.

■ The questions in counts Nos. 7 and 10 relate to defendant's alleged gambling activities and are indefinite as to time, mak-

ing it impossible to determine whether the Illinois statute of limitations governing prosecutions of misdemeanors had run.

■ The question in count No. 8 is: "Did the handbook he operated in 1947 take wagers of approximately one million nine hundred thousand dollars?" An affirmative answer to the question might have furnished evidence of defendant's evasion of the income tax laws of the United States.

■ The questions in counts 6 and 12 are: (6) "Does he know Tony Capacio?" and (12) "Does he know James Attude?". There is nothing in the record further to identify the persons referred to in these questions. Presumably they were either involved or suspected of being involved in organized crime. But the pertinency of the questions is an essential element of the offense and must be established by evidence or reasonable inferences to be drawn therefrom. Surmise or presumption cannot be relied upon to supply this ingredient of the offense charged. In the absence of any evidence tending to establish a relation between the persons named in these questions and the purposes of the inquiry, the court is unable to find that these questions were pertinent.

■ Question No. 5 stands upon a different footing. The question is: "Does he know Anthony Arcardo?" In the Interim Reports of the Special Committee which were offered in evidence there are several references to Tony Arcardo and his reputed involvement in organized crime. This question was pertinent. Although, according to the statement of Mr. Robinson, defendant was supposed to be a close associate of Arcardo, the question sought no information as to any business connection between them. It was not one of a series of questions attempting to link defendant with any illegal enterprise in which he and Arcardo might have been engaged. Mere acquaintanceship with a person of bad reputation is not in itself an incriminating circumstance. I find no justification for the refusal to answer this question.

■ In count No. 9 the question is: "In 1947 did his handbook receive its wire service from the R & H Publishing Company?". Manifestly, this question was pertinent. Defendant was not exposed to danger of prosecution if he answered it affirmatively. Under the law of Illinois gambling is a misdemeanor, and the statute of limitations of that state governing prosecutions for misdemeanors is one and one-half years. The question was put to the witness more than eighteen months after the bar of the statute became effective. The question also includes an inquiry in relation to defendant's supposed use of the R & H Wire Service in 1947; but this adds nothing that would subject the defendant to the danger of prosecution in the event he answered the question affirmatively. Defendant was not justified in refusing to answer this question.

The question in count No. 4 is: "Does he know R. L. O'Donnell?" The unique factual situation related to defendant's refusal to answer this question warrants more extended comment. The identity of R. L. O'Donnell and his connection, if any, with the defendant, were shrouded in mystery until O'Donnell appeared as a witness for defendant in the trial of this case. O'Donnell, who is a resident of Chicago, accompanied the defendant to Cleveland for this purpose. From his testimony it appears that O'Donnell was an employee of the thirty-one years,—that his work "was in the accounting field", and that he was a long-time friend of Aiuppa's. O'Donnell Union Carbide & Carbon Company for stated that he had assisted in the preparation of defendant's income tax returns and that these returns were "proper" and "correct". He also stated that he had never been engaged in any illegal activities with defendant. O'Donnell testified further that in the summer of 1950, several months before the Special Committee hearing, he was summoned to appear before an investigator for the Committee in Chicago. He stated that the investigator interviewed him about Aiuppa's income tax returns and also inquired about the defendant's business activities. O'Donnell testified further that the investigator indicated that Aiuppa would be called as a witness by the Special Committee investigating "national crime."

After the interview was terminated, O'Donnell immediately "went to see" Aiuppa and informed the latter of all that had transpired.

 If the investigation of Aiuppa's affairs through an interview with O'Donnell was pertinent to the inquiry,—and no question is raised as to this,—it would seem that a question seeking .to learn whether the defendant knew O'Donnell also would be pertinent. The question of pertinency is not dependent upon the probative value of evidence. Sinclair v. United States, 279 U.S. 263, 268, 49 S.Ct. 268, 75 L.Ed. 692.

That defendant's refusal to answer this question was a mere subterfuge is demonstrated clearly by the facts above recited. O'Donnell freely proclaimed that he and the defendant were friends of long standing. He gave testimony of the confidential business relations between them. This was done at the instance of and in behalf of the defendant. It was defendant's claim in his appearance before the Committee that to say he knew O'Donnell would be self-incriminatory. The falsity of this claim is completely exposed by O'Donnell's testimony disclosing the fact that defendant refused to divulge. His refusal was without justification.

Defendant made it abundantly clear at the outset of his examination that he was determined not to answer any questions put to him by the Committee. His was a calculated purpose to obstruct the Committee in its inquiries. This case differs from Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, and United States v. Josephson, supra, in that in the cited cases there were no specific questions pertinent to the inquiry propounded to the witnesses,. and in neither cited case did the witness rely upon his constitutional right ·to immunity. But in each of those cases, as here, there was a deliberate purpose to frustrate the efforts of a Congressional investigating committee.

Because of his assertion of constitutional rights, this court has examined defendant's claim of immunity in respect of each of the pertinent questions set forth in the indictment. There may be some ·doubt whether

this claim was asserted properly in those instances where the defendant remained mute; but this doubt has been resolved in favor of. the defendant. He has received the benefit of this court's view expressed in the DiCarlo case that in federal investigations of state and federal crimes, the constitutional immunity against self-incrimination protects a witness against disclosures that might expose him to the danger of prosecution by either the state or federal government. But, as indicated above, his guilt has ·been proved clearly as to three of the charges in the indictment. Accordingly defendant is adjudged guilty on counts 4, 5 and 9, and found not guilty on the other counts in the indictment.