**AIUPPA v. UNITED STATES.**

No. 11603.

United States Court of Appeals Sixth Circuit.

Dec. 11, 1952.

George F. Callaghan, Chicago, Ill., Fred H. Mandel, Cleveland, Ohio, on brief, for appellant.

John J. Kane, Jr., U. S. Atty., Cleveland, Ohio, Robert C. Grisanti, Asst. U. S. Atty., Cleveland, Ohio, on brief, for appellee.

Before MARTIN, McALLISTER and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

Appellant, having waived trial by jury in the United States District Court, was convicted and sentenced to six months' imprisonment and fined $1,000 for alleged contempt of a one-man sub-committee of a special committee created by Senate Resolution to investigate organized crime in interstate commerce [S.R. 202, May 3, 1950, 81st Cong., 2d Sess.]. His conviction on three counts of a twelve-count indictment was based upon his refusal, while he was an involuntary witness before the sub-committee, to answer three certain questions propounded to him, on the ground that his answers might tend to incriminate him.

Senate Resolution 202 established a special committee to consist of five senators who were authorized and directed to make a full and complete study and investigation of whether organized crime utilizes the facilities of interstate commerce, or otherwise operates in interstate commerce, in furtherance of any transactions in violation of the laws of the United States or of the State in which the trasactions occur; and, if so, the manner and extent to which and *the identity of the persons,* firms, or corporations by which such utilization is being made; what facilities are being used; and whether or not organized crime utilizes such interstate facilities or otherwise operates in interstate commerce for the development of corrupting influences in violation of laws of the United States or of any State.

The special committee was authorized to employ such officers, experts and employees as it should deem necessary in the performance of its duties, and to utilize the services, information, facilities and personnel of the various departments and

agencies of the Government to the extent that such services, information, facilities, and personnel, in the opinion of the heads of such departments and agencies, could be furnished without undue interference with the performance of the work and duties of such departments and agencies. An expense fund not to exceed $150,000 was appropriated for the use of the committee, which was directed to report to the Senate not later than a prescribed date the results of its study and investigation, together with such recommendations as to necessary legislation as it should deem advisable.

■■ This committee had the undoubted right to conduct an appropriate investigation in pursuance of the resolution, and to subpoena witnesses to appear before it and give testimony needful to enable the committee efficiently to exercise its legislative functions. McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580; Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692; In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154. But, in the conduct of an investigation by a Congressional committee, the guarantee of the Fifth Amendment to the Federal Constitution, that no person shall be compelled in any criminal case to be a witness against himself, must be scrupulously preserved. See Hoffman v. United States, 341 U.S. 479, 486, et seq., 71 S.Ct. 814, 95 L.Ed. 1118.

The three questions, refusal to answer which resulted in appellant's conviction, were specified in counts 4, 5 and 9 of the indictment and were, respectively, whether he knew R. L. O'Donnell, whether he knew Anthony Accardo, and whether, in 1947, his handbook received its wire service from the R. & H. Publishing Company.

To determine whether appellant was within his constitutional right, guaranteed by the Fifth Amendment, in refusing to answer the foregoing questions, an orderly approach would seem to be consideration first of the pertinent Supreme Court opinions upon the subject matter of constitutional immunity from self-incrimination.

Chief Justice Marshall, sitting as a trial judge in the celebrated case of United States v. Burr, 25 Fed.Cas.No. 14,692e, pages 38, 40, discussed the subject. He pointed out that the witness alone would know whether an answer to a particular question might, or might not, incriminate him; and, accordingly, if the witness should say upon his oath that his answer would incriminate him, the court can command no other testimony as to the facts. The great jurist reasoned that many links frequently compose the chain of testimony necessary to convict an individual of crime and that no witness should be compellable to furnish any one of them against himself; for it is certainly not only a possible case, but a probable one, that a witness, by disclosing a single fact, may complete the testimony against himself and to every effectual purpose accuse himself as entirely as he would by stating every circumstance required for his conviction. It was declared that the fact, of itself, might be unavailing, but all other facts without it would be insufficient. The Chief Justice asserted: "What testimony may be possessed, or is attainable, against any individual the court can never know. It would seem, then, that the court ought never to compel a witness to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws."

More than sixty years ago the Supreme Court emphasized the liberal construction which must be placed upon the constitutional prohibition against compelling a witness to give self-incriminating testimony. Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110. In Ballman v. Fagin, 200 U.S. 186, 195, 196, 26 S.Ct. 212, 50 L.Ed. 433, Mr. Justice Holmes observed that, according to United States v. Saline Bank, 1 Pet. 100, 7 L.Ed. 69, a witness had been exonerated from disclosures which would have exposed him to the penalties of *state* law. He referred also to Jack v. Kansas, 199 U.S. 372, 26 S.Ct. 73, 50 L.Ed. 234; Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; and Counselman v. Hitchcock, supra; and wrote for the Supreme

Court that the conviction of the plaintiff in error for contempt in failing to produce a cash book the production of which he said would tend to incriminate him, must be reversed.

Upon study of the authorities emphasized by the Government in support of its argument that the judgment of conviction and sentence for contempt should be affirmed in this case, we are of opinion that none gainsays the proposition that a liberal attitude must be indulged by the courts toward upholding rigidly the constitutional protection against self-incrimination provided by the Fifth Amendment. The two opinions of Mr. Justice Brown, in Brown v. Walker, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819, and Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, while not reiterating strongly, do not deny the principle. The first case merely cautions against applying the principle of Counselman v. Hitchcock to the extent of permitting a witness to decline to answer a question "for a purely fanciful protection of the witness against an imaginary danger". [161 U.S. 591, 16 S.Ct. 648.] The second case holds that the benefits of the Fifth Amendment are exclusively for protection against compelling a witness to testify against himself in a criminal case, and do not empower the witness to set up his personal privilege on behalf of another person or individual, or of a corporation of which he is an officer or employee.

It is true that, in Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288, Mr. Justice Cardozo did not enthusiastically support the doctrine of immunity from compulsory self-incrimination. Even so, he did not challenge its constitutional validity or its applicability to an appropriate case. The opinion in Mason v. United States, 244 U.S. 362, 364, 365, 37 S.Ct. 621, 61 L.Ed. 1198, quoted the language of Chief Justice Marshall in the treason case of Burr (In re Willie), 25 Fed.Cas. No.14,692e, pages 38, 39, to the effect that when a question is propounded it is for the court to consider and decide whether a direct answer to it can · implicate the witness, and if a negative conclusion be reached the witness may be required to answer without violating the constitutional privilege extended him; but that: "If a direct answer to it may criminate himself, then he must be the sole judge what his answer would be." [244 U.S. 362, 37 S.Ct. 622.] The decision of the trial judge, that neither witness had reasonable cause to apprehend danger to himself from a direct answer to any question propounded, was upheld and his judgment that two witnesses were in contempt was affirmed.

In Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138, the Supreme Court held that the privilege of the Fifth Amendment protects the witness against answering questions propounded if, considered in the light of the circumstances disclosed, the questions could not have been answered with entire impunity. The opinion quoted from Counselman v. Hitchcock, 142 U.S. 547, 562, 12 S.Ct. 195, 35 L.Ed. 1110: "The object was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime." It was said that the constitutional protection against self-incrimination was not removed by a relevant provision of an Act of Congress that no testimony given by the witness in the circumstances could be offered in evidence against him in any criminal proceeding; for, as was asserted in Counselman v. Hitchcock, supra: "It could not and would not prevent the use of his testimony to search out other testimony to be used in evidence against him or his property."

The opinion in United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542, makes it clear that since the "privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation."

The foregoing review of earlier important opinions of the Supreme Court upon the subject matter brings us to a consideration of five recent opinions of the highest tribunal. United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884, upheld the conviction of a witness for violation of a

federal statute in failing to produce records in compliance with a subpoena by a House Committee on un-American Activities. The case seems, in no respect, apposite here.

But the cases of the two Blaus—husband and wife—argued in the Supreme Court on November 7, 1950, and decided on different dates shortly thereafter, do have direct bearing upon the issue now before us. In a United States District Court, both Blaus had been adjudged guilty of contempt in declining, on the ground of possible self-incrimination, to answer certain questions before a federal grand jury; and their convictions had been affirmed by the Court of Appeals. Blau v. United States, 10 Cir., 179 F.2d 559; Id., 10 Cir., 180 F.2d 103. The Supreme Court reversed the judgment in each case.

In the wife's case, Blau v. United States, 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L. Ed. 170, she had refused to answer questions concerning the Communist Party of Colorado and her employment by it on the ground that her answers might tend to incriminate her. Among other questions which she refused to answer were inquiries as to whether she knew the names of the state officers of the Communist Party and of any persons who might now have the books and records of that party. At the time she was questioned, the Smith Act, 18 U.S.C.A. § 2385, was in effect, making it a crime to advocate the overthrow of the Government by force or violence, to organize or help organize any society or group which teaches, advocates or encourages the overthrow of the Government, or to be or become a member of such group with knowledge of its purposes. Mr. Justice Black, delivering a unanimous opinion of the highest court, said: "These provisions made future prosecution of petitioner far more than 'a mere imaginary possibility * * *.' Mason v. United States, 244 U.S. 362, 366, 37 S.Ct. 621, 622, 61 L.Ed. 1198; she reasonably could fear that criminal charges might be brought against her if she admitted employment by the Communist Party or intimate knowledge of its workings. Whether such admissions by themselves would support a conviction under a criminal statute is immaterial. Answers to the questions asked by the grand jury would have furnished a link in the chain of evidence needed in a prosecution of petitioner for violation of (or conspiracy to violate) the Smith Act. Prior decisions of this Court have clearly established that under such circumstances, the Constitution gives a witness the privilege of remaining silent. The attempt by the courts below to compel petitioner to testify runs counter to the Fifth Amendment as it has been interpreted from the beginning. United States v. Burr, 25 Fed.Cas., p. 38, No. 14,692e, decided by Chief Justice Marshall in the Circuit Court of the United States for the District of Virginia; Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; Ballmann v. Fagin, 200 U.S. 186, 26 S.Ct. 212, 50 L.Ed. 433; Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138; Boyd v. United States, 116 U. S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Cf. United States v. White, 322 U.S. 694, 698, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542."

In Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 302, 95 L.Ed. 306, the husband had claimed his constitutional rights to decline to answer questions, before a federal grand jury, concerning the activities and records of the Communist Party of Colorado. He had also refused to reveal the whereabouts of his wife, who was wanted by the grand jury as a witness in connection with the same investigation. The Supreme Court said: "For the reasons set out in our recent opinion in Blau v. United States, 340 U.S. 159, 71 S.Ct. 223 [95 L. Ed. 170], we hold it was error to fail to sustain the claim of privilege against self-incrimination."

In Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 440, 95 L.Ed. 344, decided about six weeks after publication of the opinion in the second Blau case, a divided Supreme Court affirmed the conviction of a witness for contempt, for refusal to answer certain questions asked by a federal grand jury with respect to the books and records of the Communist Party of Denver. The witness testified without objection that she had been treasurer of that organization, had been in possession of its

records, and had turned them over to another person whose identity she refused to reveal for the sole reason that she did not wish to subject another person to the same thing that she was "going through." The Supreme Court stated: "If petitioner desired the protection of the privilege against self-incrimination, she was required to claim it. United States v. Monia, 1943, 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 376. The privilege 'is deemed waived unless invoked.' United States v. Murdock, 1931, 284 U.S. 141, 148, 52 S.Ct. 63, 64, 76 L.Ed. 210." Nothing in the opinion of Chief Justice Vinson detracts from the opinion of Mr. Justice Black in Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170: for the Chief Justice said that, in the Blau case, the court had held that "questions as to connections with the Communist Party are subject to the privilege against self-incrimination as calling for disclosure of facts tending to criminate under the Smith Act". The Supreme Court thus distinguished the cases: "But petitioner's conviction stands on an entirely different footing, for she had freely described her membership, activities and office in the Party. Since the privilege against self-incrimination presupposes a real danger of legal detriment arising from the disclosure, petitioner cannot invoke the privilege where response to the specific question in issue here would not further incriminate her. Disclosure of a fact waives the privilege as to details. * * * As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of further crimination." [340 U.S. 372, 373, 374, 71 S.Ct. 441.]

The latest and most important decision of the Supreme Court in relation to the subject matter is Hoffman v. United States, 341 U.S. 479, 486, 487, 490, 71 S.Ct. 814, 95 L.Ed. 1118, wherein it was held that the privilege against self-incrimination, guaranteed by the Fifth Amendment, applies not only to answers which would support a conviction under a criminal statute of the United States, but also to answers which would furnish a link in the chain of evidence needed to prosecute a witness for a federal crime. The opinion points out that the guarantee of the Fifth Amendment against testimonial compulsion, as was said in Feldman v. United States, 322 U.S. 487, 489, 64 S.Ct. 1082, 1083, 88 L.Ed. 1408, "was added to the original Constitution in the conviction that too high a price may be paid even for the unhampered enforcement of the criminal law and that, in its attainment, other social objects of a free society should not be sacrificed." Citing Counselman v. Hitchcock, supra, and Arndstein v. McCarthy, supra, the court said that this provision of the Fifth Amendment must be accorded liberal construction in favor of the right which it was intended to secure. The court declared, however, that the constitutional protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer, Mason v. United States, supra; and that he is not exonerated from answering merely because he declares that, in so doing, he would incriminate himself, it being for the court to say whether his silence is justified, Rogers v. United States, supra, and to require him to answer if it clearly appears to the court that he is mistaken in his view of the hazards of self-incrimination. The opinion added: "However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.' See Taft, J., in Ex parte Irvine, C.C.S.D.Ohio 1896, 74 F. 954, 960." [341 U.S. 479, 71 S.Ct. 818.]

The conviction of contempt in the District Court, which had been affirmed by the Court of Appeals for the Third Circuit, was

reversed; United States v. Hoffman, 185 F. 2d 617, and, in concluding the opinion from which only one Justice dissented, the Supreme Court, through Mr. Justice Clark, said: "For these reasons we cannot agree with the judgments below. If this result adds to the burden of diligence and efficiency resting on enforcement authorities, any other conclusion would seriously compromise an important constitutional liberty. 'The immediate and potential evils of compulsory self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime.' United States v. White, 1944, 322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542. Pertinent here is the observation of Mr. Justice Brandeis for this Court in McCarthy v. Arndstein, 1924, 266 U.S. 34, 42, 45 S.Ct. 16, 17, 69 L.Ed. 158: 'If Congress should hereafter conclude that a full disclosure * * * by the witnesses is of greater importance than the possibility of punishing them for some crime in the past, it can, as in other cases, confer the power of unrestricted examination by providing complete immunity.' Reversed."

We turn now to a consideration of a few applicable opinions of the Courts of Appeals of the United States. Two opinions from the Fifth Circuit, dealing with convictions for contempt of the special committee created by Senate Resolution 202 of the 81st Congress, Second Session (adopted May 3, 1950), are directly in point. In both cases, judgments of conviction for contempt of the congressional committee were reversed; and judgments of acquittal were entered.

In one of these cases, Poretto v. United States, 5 Cir., 196 F.2d 392, 396, wherein the appellant refused to state, among other things, *whether he knew a certain man*, it was held that the constitutional privilege against self-incrimination extends not only to answers which would support a conviction, but to those that would furnish a link in the chain of evidence necessary to convict the witness of a federal crime. The court declared that the "probing of the mind of a witness whose business, allegedly, is organized crime on a nationwide scale is not permissible under the Fifth Amendment by a legislative body any more than by a judicial tribunal." The opinion pointed out that the appellant knew when he was interrogated that the chairman of the Senate committee had been reported as saying that the witness had been associated with a person proclaimed in a newspaper article to be "Crime Czar and head of the Mafia." Attention was directed to the manner in which the chairman had dealt with the witness by reading him a report concerning his connections with a criminal Chicago mob and about his having attempted to set up a bootleg wire service in Houston, Texas, with the result that the appellant had been "run out of there." The chairman also said to appellant, when he refused to answer whether or not he was under indictment: "Well, if you are under indictment you have already taken one step toward incriminating yourself. That is a public record." Concerning this statement by the chairman of the Senate committee, the Court of Appeals said: "It is well settled that an indictment is not evidence against the defendant, and does not affect the presumption of innocence that the law throws around him; it is not a step taken by the defendant, but a presentment made against him by the grand jury."

The Poretto opinion adverted to the fact that the record disclosed that state and federal district attorneys and law enforcement officers had been present at the hearing before the committee. This statement was made: "None of these facts was calculated to allay the appellant's fear of self-incrimination; on the contrary, the imminent danger of his position was such as to generate in his mind the thought that he might be arrested before he left the room if he gave the wrong answer or made a false procedural step." It was observed that "the deft questioning of the examiner" evinced a clear purpose to prize open the mind of the witness and "get at some other offense in addition to the one for which he had been arrested."

The Court of Appeals held further that, while newspaper articles are not admissible as proof of the facts stated therein, such articles are admissible to show comment that

reasonably may have caused apprehension to a person that he was in real danger of being prosecuted for an offense, and might justify him in refusing to answer questions on the ground that his answers might incriminate him. The court declared its conviction that the appellant had been confronted with a very real danger of self-incrimination of the commission of perjury unless he refused to answer the questions propounded to him; and that this strong dilemma in a desperate case left him no recourse for protection except the Fifth Amendment, "the palpable purpose of the questions being to identify him as a criminal."

In the other case from the Fifth Circuit, Marcello v. United States, 196 F.2d 437, 442, it was held, among other things, that in a hearing before the special committee of the United States Senate investigating organized crime a witness was justified in refusing to answer, on the ground that his answer might tend to incriminate him, *whether he knew a certain person* alleged to have been connected with a murder. In relation to "do-you-know" questions, the Court of Appeals cited the following authorities: Estes v. Potter, 5 Cir., 183 F.2d 865, 867; Alexander v. United States, 9 Cir., 181 F.2d 480; Kasinowitz v. United States, 9 Cir., 181 F.2d 632; United States v. Raley, D.C., 96 F.Supp. 495; United States v. Jaffee, D.C., 98 F.Supp. 191–195; United States v. Emspak, D.C., 95 F.Supp. 1012. The Marcello case is authority also for the proposition that, where the position of a witness in a hearing before the Senate crime investigating committee was virtually that of an accused person on trial, a blanket refusal on his part to answer questions was not contemptuous.

The Third Circuit Court of Appeals, in United States v. Coffey, 198 F.2d 438, reversed the conviction of a witness for contempt in refusing to answer, before a grand jury, whether others were engaged in a numbers racket, upon the ground that his answer might tend to incriminate him. The Court of Appeals pointed out that its judgment had been reversed by a bare order of the Supreme Court upon the authority of Hoffman v. United States, supra, in Greenberg v. United States, 343 U.S. 918, 72 S. Ct. 674, wherein the Court of Appeals had affirmed the conviction of Greenberg for contempt in the United States District Court in refusing to obey a court order requiring him to answer certain questions before a federal grand jury. United States v. Greenberg, 3 Cir., 192 F.2d 201. The Court of Appeals added that the Supreme Court had also, by bare order upon the authority of its opinion in the Hoffman case, supra, and its Greenberg case, supra, reversed the judgment of the Court of Appeals affirming a contempt conviction of another witness predicated upon his refusal to answer very similar questions concerning the business of other persons. Singleton v. United States, 343 U.S. 944, 72 S.Ct. 1041, reversing United States v. Singleton, 3 Cir., 193 F.2d 464.

In reversing a conviction for contempt of a witness before a grand jury, in his refusal to answer a question as to who operated a certain gambling house, where the witness had stood upon the ground that an answer might tend to incriminate him of federal offenses, Judge Goodrich said: "If our conclusion permits, in the individual case, a rascal to go unwhipped or a villain unhung, it is because Americans have thought it better public policy to lose a conviction now and then than to force a conviction from the defendant's own mouth." United States v. Girgenti, 3 Cir., 197 F.2d 218, 221.

In United States v. Costello, 2 Cir., 198 F.2d 200, the appellant Costello had been charged by the Senate crime investigating committee with being one of the leaders of a major crime syndicate. The Court of Appeals for the Second Circuit reversed his conviction for contempt on seven counts and affirmed on three counts of a ten-count indictment. The reversals were based on the refusal of the witness to reveal to the committee the amount of his net worth and his indebtedness, on the ground that his answers might tend to incriminate him; and the affirmances were based on his refusal to give any testimony whatever pertinent to the questions under inquiry, on the ground that he was suffering from laryngitis, and on his wilful default in terminating his appearance before the com-

mittee. The Costello decision adds no strength to the Government's position in the case at bar.

Three recent cases in which United States Courts of Appeals have reversed judgments of conviction in criminal contempt proceedings, for refusal by the defendants to answer questions for the reason that they had reasonable grounds to believe that they might incriminate themselves by answering, are Estes v. Potter, 5 Cir., 183 F.2d 865; Kasinowitz v. United States, 9 Cir., 181 F.2d 632; and United States v. Rosen, 2 Cir., 174 F.2d 187.

Many years ago, a scholarly opinion, to which reference has been made earlier in this writing, was composed by Chief Justice Taft, then Circuit Judge, in Ex parte Irvine, C.C., 74 F. 954. This opinion is still an important authority upon the constitutional immunity guaranteed by the Fifth Amendment against compulsory self-incrimination.

There have been called to our attention numerous recent well reasoned district court opinions, some of which were delivered orally and others are yet unpublished, in which defendants charged in indictments with contempt of the Senate crime investigating committee have been found not guilty. To discuss and compare these cases with the case now before us would extend this opinion to too great length, but weight is found in them to support the conclusion which we have reached.

No witnesses were put on the stand in the case at bar, but the evidence introduced by the Government at the trial in the United States District Court consisted solely of documentary exhibits, among which were reports of the special senate committee constituted to investigate crime in interstate commerce, minutes of some of its proceedings, and a transcript of the proceedings before the special committee at Cleveland, Ohio, on January 19, 1951, at which appellant Aiuppa declined to answer all questions on the ground that his answers might tend to incriminate him, and refused to answer certain specific questions on which his indictment for contempt of the committee was based.

Evidence introduced on behalf of the defendant consisted of the testimony of a single witness, Richard O'Donnell, and much documentary proof consisting of interim reports of the special Senate committee and of important and relevant stipulated facts. It was stipulated, among other things, that when appellant was called to testify and duly sworn as a witness at the hearing before the special committee, there were present numerous investigators of government departments: namely, the Treasury Department, the Bureau of Internal Revenue, the Bureau of Narcotics, the Immigration and Naturalization Service, the Customs Bureau, the Alcohol Tax Unit, the Department of Justice, the Attorney General's office, and the Federal Bureau of Investigation; and that there were also present numerous investigators from the Senate committee itself, as well as the chief counsel, the assistant counsel, and the associate counsel for the committee. It was stipulated further that there were present newspaper reporters and radio and television announcers.

As has been stated, the special Senate committee was created to investigate organized crime in interstate commerce. It was vested with broad powers to investigate violations of both federal and state criminal laws. Its purpose was to ascertain among other things, *the identity of persons,* firms, or corporations, which were utilizing the facilities of interstate commerce for criminal purposes.

The committee reports reveal that it investigated wire service operations in connection with gambling and interstate transactions of racketeers, the violation of laws against transportation of slot machines and other gambling devices in interstate commerce, and the use of the mails for lottery purposes. The reports show that the committee investigated also the violation of the Dyer Act, 18 U.S.C.A. §§ 10, 2311–2313, the Mann Act, 18 U.S.C.A. §§ 2421–2423, kidnaping, extortion, and anti-narcotic statutes, and other federal laws against crime, in addition to the violation of federal conspiracy statutes in relation to such federal offenses.

It is obvious from the record in this case that the motive of the committee and its examiners in calling Aiuppa as a witness was largely to connect him, by his own admission, with the operations of nefarious organizations engaged in criminal activities on a national scale. This national crime syndicate, as appears from frequent statements in the report of the special Senate committee, was described as the "Capone Syndicate," the "Chicago Syndicate," the "Chicago Mob," or the "Accardo-Guzik-Fischetti Gang." In various reports, the members of these sinister combinations were charged with numerous violations of both state and federal laws.

The record of the proceedings before the special committee, when the chairman as a one-man sub-committee was holding the investigation at Cleveland on January 19, 1951, shows that, after appellant had refused to answer the questions propounded to him, the chairman asked: "Any questions from the press about Mr. Aiuppa?" He then stated that he would call on Mr. Robinson, associate counsel for the committee, to give for the record a brief statement of the background of the matters about which he was endeavoring to question Mr. Aiuppa. The associate counsel responded by saying that appellant had been considered to be "one of the closest associates of Tony Accardo," and had been a partner with Claude Maddox, whose alias was "Screwy Moore," in Taylor & Company, one of the country's largest manufacturers of gambling equipment, such as dice, crap tables, roulette wheels, and various gambling devices. The associate counsel stated: "There is also some question, which I hope to develop from Aiuppa, as to how he got into this Taylor Manufacturing Company, whether it was a muscle job or not." He asserted that this manufacturing company had a modern, substantial building in Cicero, Illinois, where it employed a crew of working girls. The attorney said further that Claude Maddox, alias "Screwy" Moore, had a long criminal record and was tied in with the "St. Louis Mob." The attorney observed that he had testimony that Taylor & Company had sold, over a period of years, some $75,000 worth of equipment to the Hyde Park Club, which had been raided. He asserted further that Aiuppa was supposed to have an interest in the Turf Club and the Paddock Lounge, and that one of the customers of Taylor & Company, known as Billy's Bar, was operated by Ralph Capone; and that the list of customers at Taylor & Company was to be a subject of inquiry of Aiuppa by the examining attorneys. He said that sales of dice and crap tables were made by Taylor & Company "all over the country."

The associate attorney for the committee stated, also, that Aiuppa had an interest in a book-making establishment, situated in a pool room at 4831 West Cermak Road, in which the wagerings for one year were $400,000 and for another year about $1,900,000. The committee chairman asked the attorney to disclose who was Aiuppa's partner in the hand-book operation. The attorney replied that there was no indication that appellant was a partner with any one in that business, that he had desired to question him about it and also to ask him how, where, and what he paid for the wire service to the bookmaking establishment; whether he got it from the R. & H. by reason of any possible connection with Hymie Levine and Ray Jones, and what he paid for it. The attorney asserted that, from records in his possession, appellant definitely was in the hand-book operation; and that, for the past three years, the gross income of the business would approximate between $200,000 and $300,000.

From all the foregoing statements of the committee attorney, it is evident that most of the information sought to be elicited from Aiuppa concerning his activities was already in the hands of the committee. A news reporter queried the attorney as to whether appellant was in hand-book operations other than the one at 4831 Cermak Road. The lawyer answered that he could not say, and that one of the things about which he desired to question Aiuppa was what interest he had in a place called "Greyhound Recreation."

Throughout the attorney's statement as to what he expected to inquire of Aiuppa, news reporters frequently intervened with questions. The chairman of the committee

asked its examining attorney to reveal the relevancy of a question which had been asked Aiuppa "about some place in Wisconsin." The lawyer replied that there had been difficulty in serving a subpoena on appellant; that it had been learned subsequently to service upon him that he had a place in Wisconsin, some sort of hunting lodge; and that he had wanted to find out from appellant "who else was possibly hiding out up there with him." A news reporter volunteered: "That is for [sic, from] my information over near Eagle River, which is where Tony Accardo's four kids spend their summers." The committee attorney said, "that's right."

The committee reports make frequent reference to Accardo, designating him as head of a national crime syndicate, and disclose frequent statements by the committee that the R. & H. Publishing Company was controlled by Accardo and Capone mobsters, including Ray Jones and Hymie Levine and by a man who participated in the Guzik-Accardo-Russell maneuver to take over the S. & G. Wire Service in Florida. These racing news services distributed information to numerous book-making outfits. Committee reports included statements that one of the two major crime syndicates had an axis between Miami and the Capone Syndicate of Chicago, headed by Tony Accardo, the Fischetti brothers, and Jake Guzik; and the other had an axis between New York and Miami, headed by Frank Costello and Joe Adonis. Accardo, Guzik and Murray Humphreys were reported to be engaged "in illegal activities, the top racketeers of the community, whom the law rarely touches."

One committee report stated that, as of now, the major criminal organization of Chicago is still the Capone Syndicate which is active in various forms of gambling, in prostitution, in the distribution of narcotics, and in the control of wire services transmitting gambling information; that the Chicago crime syndicate had extended its operations to other cities, that the principal evidence of its nation-wide operation is its apparent control of the wire services to book-makers which provides a stranglehold over large book-making operations;

and that, to the extent to which the Capone Syndicate controls the wire service, it is in proportionate measure a partner of every book-maker of any consequence in the country. The Capone Mob of Chicago was said to be affiliated with the Mafia, which helps cement the New York and Chicago crime syndicates as well as smaller criminal gangs and individual criminals throughout the country, these groups having "kept in touch with Luciano since his deportation from this country."

A committee report states further that the domination of the Mafia is based fundamentally on "muscle" and "murder," ruthless destruction of anyone who betrays its secrets and the use of all means available, such as political influence, bribery or intimidation, to defeat any attempt on the part of law enforcement agencies to touch its top figures or to interfere with its operation. Ten pages of a committee report describe "the role of wire service in organized crime," and make frequent reference to the control of the R. & H. Publishing Company by Accardo and the Chicago crime syndicate.

From the foregoing excerpts from various reports of the crime committee and the statements made by its chairman and its attorneys, with respect to appellant, it becomes evident that answers to the questions asked by the committee counsel might well have furnished a link in the chain of evidence needful for his prosecution for a federal crime. It cannot logically be said that it would be unreasonable for appellant to consider that answers in response to the questions asked might endanger him by injurious disclosure. In the setting and background of the investigation, it is perfectly clear from a careful consideration of all the circumstances that the witness was not mistaken in thinking that answers to the questions asked him could possibly have a tendency to incriminate him. See Hoffman v. United States, supra.

At the outset of his examination before the Senate crime committee, appellant, after stating his name and giving his residence address as 1836 Fifty Eighth Avenue, Cicero, Illinois, was asked whether he had a place in Wisconsin. He responded:

"Gentlemen, I must stand on my constitutional rights, I will refuse to answer all questions on the ground that it may tend to incriminate me." The committee chairman directed him to answer the question, which he declined to do on the ground that it might tend to incriminate him.

He next refused to reveal his age; whereupon, the chairman directed him to answer and thus admonished him: "Let me make it plain to you. We are just trying to get some facts and information for a Senate report, Mr. Aiuppa. This is not a court, you are not on trial for anything, and we want to treat you fairly but, of course, we are not going to get along very well if you won't even tell us where you live and how old you are. [Addressing the committee attorney]: Go ahead, Mr. Robinson." The attorney then asked the witness whether he knew certain named persons; what was the business of Taylor & Company, and whether or not it was a legitimate business; and whether it manufactured gambling equipment, dice, crap tables and roulette wheels. Appellant refused to answer all these questions, restating that he stood on his constitutional rights. For the same stated reason, he refused to answer, though ordered by the chairman to do so, whether he knew R. L. O'Donnell and Anthony Accardo.

He continued to refuse to answer questions propounded by the attorney, although ordered by the chairman to do so; and, finally, stood mute and made no response to any questions asked. The chief counsel for the committee said: "Let the record show that the witness just sits there mute, chewing gum, saying nothing." Among the questions to which he made no response was whether his hand-book received its wire service from the R. & H. Publishing Company. The chairman finally said: "I don't think there is much use, Mr. Robinson, of going on with this witness."

However, the committee attorney was permitted to ask a few more questions, to which appellant made no response. The chairman then interposed: "Let the record show to those questions he is remaining mute. Well, Mr. Aiuppa, you are just not going to answer any questions, is that your idea?" The chairman said: "Let the record show in answer to that he remains mute. I think I might call your attention to the fact that each proper question you refuse to answer I hope will be adjudged to be a separate offense, but you still refuse to answer any questions?" The witness made no comment; and the chairman closed with this statement: "Let the record show he refuses to say anything whatsoever, that Mr. Robinson and Mr. Halley and Mr. Nellis [committee attorneys] are present. You remain under a subpoena and we will take whatever action we can to see that you don't get by with this contemptuous attitude toward a committee of the United States Senate, Mr. Aiuppa. That will be all."

The United States District Judge held that appellant was not guilty of contempt in refusing to answer the questions described in counts one, two, three, six, seven, eight, ten, eleven, twelve of the indictment, which respectively inquired as to whether the witness had a place in Wisconsin; whether he was a partner of Ansone, Maddox, "Screwy" Moore; and Milner and Johnson in Taylor & Company; whether that company manufactured gambling equipment, dice, crap tables and roulette wheels; whether he knew Tony Capacio; whether at one time he operated a hand-book and pool room at 4831 West Cermak Road; whether the hand-book he operated in 1947 took wagers of approximately $1,900,000; whether he knew what the Greyhound Recreation is; whether he knew the total volume of business done by that company; and whether he knew James Attude. He was convicted on counts four, five and nine of the indictment, which charged that he was in contempt of the Senate Committee in declining to answer, respectively, whether he knew R. L. O'Donnell; whether he knew Anthony Accardo; and whether, in 1947, his hand-book received its wire service from R. & H. Publishing Company.

The opinion of the District Judge is reported in United States v. Aiuppa, D.C. N.D.Ohio, 102 F.Supp. 609, decided February 7, 1952. On the same day, the District Judge announced opinions in two cases

in which the defendants were charged with contempt of the same special committee of the United States Senate. In both cases, he adjudged the defendants not guilty on all counts of the respective indictments. United States v. DiCarlo, D.C.N.D.Ohio, 102 F.Supp. 597; United States v. Licavoli, D.C. N.D.Ohio, 102 F.Supp. 607.

We think the decision of the District Court, finding appellant guilty on counts four, five and nine, was inconsistent with his adjudication that appellant was not guilty on the other nine counts of the indictment and with his judgment that the defendants DiCarlo and Licavoli were not guilty on all counts of the indictments in the other two cases decided on the same day. Not only were the findings of guilt in the instant case inconsistent; but they were also clearly erroneous, as readily appears from the foregoing review of authorities in relation to the facts in this case.

In reference to count four, the witness O'Donnell had been interviewed by the associate counsel of the committee prior to his appearance as a witness at the trial of appellant. He had been questioned about appellant Aiuppa, a friend of his of long standing: whether or not Aiuppa operated a hand-book on Cermak Road, and the amount of business he handled; his association with Accardo; whether Aiuppa was a member of the Capone Gang; whether he was associated with Maddox, alias "Screwy" Moore; and other matters of like character. The attorney had also asked O'Donnell whether appellant had used muscle in obtaining business for his gambling equipment concern.

■■ O'Donnell swore that, immediately after he had been questioned by the committee attorney, he went directly to see appellant and told him everything that had occurred in his conversation with the committee lawyer. Thus, it was obvious that appellant could have reasonably anticipated the purpose of the committee to connect him dangerously with criminal activities, if he admitted knowing O'Donnell, who had for years assisted him in the preparation of his income tax returns. O'Donnell testified that the gambling devices and equipment manufactured by Taylor & Company had been transported in interstate commerce throughout the entire country. Appellant could logically have expected that, had he admitted that he knew O'Donnell, follow-up questions by the committee attorney undoubtedly would have sought to elicit from him deleterious admissions concerning his income tax returns, his unlawful transportation of gambling devices in interstate commerce; his connections with unlawful combinations and conspiracies to violate federal laws, and perhaps violations of other federal statutes. As was said in Hoffman v. United States, supra: "To sustain the privilege [against self-incrimination], it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." 341 U.S. 486, 487, 71 S.Ct. 818.

■ Upon the same principles, it is manifest that on count five appellant was also within his constitutional right in declining to answer whether he knew Anthony Accardo. It is undoubtedly true that the examining attorney representing the Senate committee was aware that appellant knew Accardo and that the question was, therefore, merely preliminary to others which would attempt to connect appellant with the operations of this widely known criminal in violations of numerous federal laws. We are unable to agree with the statement of the District Judge that the question "was not one of a series of questions attempting to link defendant with any illegal enterprise in which he and Arcardo might have been engaged." 102 F.Supp. 613. We think it obvious from the record that the exact reverse of that statement is true. The assertions of the committee attorney already quoted indicate his fixed purpose to incriminate appellant by his own admissions and to connect him with the criminal activities of the notorious Anthony Accardo.

■ Moreover, we are unable to agree with the reasoning of the District Judge as to count nine, in which he found appellant guilty of contempt for declining to answer whether or not his hand-book received its wire service in 1947 from the R. & H. Pub-

lishing Company. . As has already been shown, the Senate committee in its report stated that wire service was a most important means employed by combinations of criminal racketeers, including Accardo, to control unlawful book-making activities in interstate commerce. Admission by appellant that he had received wire service in the specified year from R. & H. Publishing Company could have connected him with a continuing conspiracy to violate federal, as well as state, laws. The committee report made several references to the R. & H. Publishing Company as controlled by the Capone Syndicate, by Tony Accardo, and the Chicago Syndicate; and that the Capone Mob in Chicago is Mafia affiliated.

In this opinion, we have endeavored to present this case and now rest decision in it upon the basis of existing authority, though the case possesses some novelty. But, in concluding, we think it may not be amiss to say that, notwithstanding the pronouncements of the committee chairman as to intended fairness, the courts of the United States could not emulate the committee's example and maintain even a semblance of fair and dispassionate conduct of trials in criminal cases.

Despite the enjoyment by millions of spectators and auditors of the exhibition by television of the confusion and writhings of widely known malefactors and criminals, when sharply questioned as to their nefarious activities, we are unable to give judicial sanction, in the teeth of the Fifth Amendment, to the employment by a committee of the United States Senate of methods of examination of witnesses constituting a triple threat: answer truly and you have given evidence leading to your conviction for a violation of federal law; answer falsely and you will be convicted of perjury; refuse to answer and you will be found guilty of criminal contempt and punished by fine and imprisonment. In our humble judgment, to place a person not even on trial for a specified crime in such predicament is not only not a manifestation of fair play, but is in direct violation of the Fifth Amendment to our national Constitution.

The judgments of conviction and sentence of appellant upon all three counts of the indictment are reversed; and a judgment of acquittal of appellant is here ordered.

Judge MILLER concurs in the result on the authority of Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118; Poretto v. United States, 5 Cir., 196 F.2d 392; Marcello v. United States, 5 Cir., 196 F.2d 437; United States v. Coffey, 3 Cir., 198 F.2d 438; United States v. Girgenti, 3 Cir., 197 F.2d 218; United States v. Costello, 2 Cir., 198 F.2d 200.