## HUTCHESON *v.* UNITED STATES.

No. 46. Argued November 6, 1961.—Decided May 14, 1962.

*Frederick Bernays Wiener* argued the cause for peti-
tioner. With him on the briefs were *Charles H. Tuttle*
and *Joseph P. Tumulty, Jr.*

*Solicitor General Cox* argued the cause for the United States. With him on the briefs were *Assistant Attorney General Miller, Philip R. Monahan, Beatrice Rosenberg* and *Jerome M. Feit.*

MR. JUSTICE HARLAN announced the judgment of the Court and an opinion in which MR. JUSTICE CLARK and MR. JUSTICE STEWART join.

After a trial without a jury, petitioner was found guilty on all 18 counts of an indictment charging him with having violated 2 U. S. C. § 192[1] by refusing to answer pertinent questions put to him on June 27, 1958, by the Senate Select Committee on Improper Activities in the Labor or Management Field, commonly known as the McClellan Committee. He was sentenced to six months' imprisonment and fined $500. The judgment was affirmed by the Court of Appeals, without opinion. We granted certiorari to consider petitioner's constitutional challenges to his conviction. 365 U. S. 866.

The McClellan Committee was established by the Senate in 1957

"to conduct an investigation and study of the extent to which criminal or other improper practices or activities are, or have been, engaged in in the field of labor-management relations or in groups or organi-

[1] "§ 192. Refusal of witness to testify or produce papers.

"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

zations of employees or employers to the detriment of the interests of the public, employers or employees, and to determine whether any changes are required in the laws of the United States in order to protect such interests against the occurrence of such practices or activities." S. Res. 74, 85th Cong., 1st Sess. (1957).[2]

Pursuing an investigative pattern which in 1957 and the the forepart of 1958 had disclosed misuse of union funds for the personal benefit of various union officials,[3] the Committee on June 4, 1958, began hearings at Washington, D. C., into the affairs of various organizations, including the United Brotherhood of Carpenters and Joiners of America of which the petitioner was president. Initially, the Committee sought to inquire into the personal financial interests of petitioner and other officials of the Carpenters Union in the World Wide Press, a New York publishing house owned by one Maxwell Raddock, which was publisher of the "Trade Union Courier." More especially the Committee wished to learn whether union funds had been misused in the publication by the Press of a biography of petitioner's father, entitled "The Portrait of an American Labor Leader, William L. Hutcheson." Senator McClellan, Chairman of the Committee,

---

[2] The original resolution provided that the Committee was to exist until January 31, 1958. Its term was thereafter extended for an additional 26 months by several Senate Resolutions. S. Res. 221, 85th Cong., 2d Sess. (1958); S. Res. 44, 86th Cong., 1st Sess. (1959); S. Res. 249, 86th Cong., 2d Sess. (1960).

[3] See S. Rep. No. 1417, 85th Cong., 2d Sess. (1958). See also S. Rep. No. 621, 86th Cong., 1st Sess. (1959); S. Rep. No. 1139, 86th Cong., 2d Sess. (1960). The reports covered 2,032 pages and summarized 46,150 pages of testimony taken during 270 days of hearings at which 1,526 witnesses appeared. S. Rep. No. 1139, pt. 4, 86th Cong., 2d Sess. 868 (1960).

announced that the petitioner and Raddock would both be called to testify.[4]

On June 25 Raddock testified as to the affairs of the "Trade Union Courier" and the publication of the

---

[4] The Chairman's full opening statement, which appears at pp. 11785–11786 of the Hearings before the Select Committee on Improper Activities in the Labor or Management Field, pt. 31, 85th Cong., 2d Sess. (1958) (hereinafter Hearings), is as follows:

"The committee will hear witnesses today on the operations of Mr. Maxwell Raddock, owner of the World Wide Press, a large New York printing plant, and publisher of the Trade Union Courier.

"Witnesses will be called to testify as to financial interests and investments in the World Wide Press by labor organizations and certain labor officials and the unorthodox manner in which bonds of the company were issued and handled.

"The committee will also inquire into the propriety of labor officials' having financial interests in Maxwell Raddock's company at the same time that they invested considerable sums of their union's funds in the plant that prints the Trade Union Courier and in subscriptions to that paper.

"The manner in which advertisements were solicited by the Trade Union Courier has been the subject of investigation by the committee staff. The committee is particularly interested in whether solicitors employed by the Trade Union Courier represented it as the organ of the AFL–CIO as well as making other false representations.

"Preliminary investigation by the staff has disclosed certain financial transactions of the United Brotherhood of Carpenters which require explanation.

"One of these transactions involves very large expenditures in the publication of a book entitled, 'The Portrait of an American Labor Leader, William L. Hutcheson.'

"Maurice Hutcheson, who is now president of the United Brotherhood of Carpenters, and Mr. Raddock will be questioned about this matter.

"The Chair may say that during the existence of this committee we have had much information and a great deal of testimony regarding the misuse of union funds, regarding personal financial gain and benefit and profit and expenditure of such funds by union officials, and we are still pursuing that aspect of labor-management relations.

"We have also had considerable evidence of collusion between

Hutcheson book.[5] On the following day, however, he claimed the Fifth Amendment privilege against self-incrimination with respect to another matter to which the Committee had turned. That matter related to the possible use of union funds or influence to "fix" a 1957 criminal investigation, conducted in Lake County, Indiana, by a state grand jury, into an alleged scheme to defraud the State of Indiana, in which petitioner and two other officials of the Carpenters Union, O. William Blaier and Frank M. Chapman, were allegedly implicated.

The alleged scheme to defraud had been revealed in testimony given before a Subcommittee of the Senate Committee on Public Works during May and June 1957. That testimony had disclosed that in June 1956 the petitioner, Blaier, and Chapman had together bought, in their individual capacities, certain real property in Lake County for $20,000, and had shortly thereafter sold it, at a profit of $78,000, to the State of Indiana for highway construction purposes, pursuant to an agreement whereby a deputy in the Indiana Right-of-Way Department was paid one-fifth of that profit.[6] The ensuing grand jury proceeding had been terminated in August 1957 without any indictment having been found, with an announcement by the county prosecutor, Metro Holovachka, that "jurisdiction" over the matter was lacking in Lake County, and that the entire $78,000 profit had been returned to the State. Thereafter, in February 1958,

management and union officials where they both profit at the expense of the men who work and pay the dues.

"In this particular instance, there is indication that the union membership have again been imposed upon by transactions that have occurred that we will look into as the evidence unfolds before us."

[5] Hearings, 11932–11995, 12000–12006.

[6] Investigation of Highway Right-of-Way Acquisition—State of Indiana, Hearings before a Subcommittee of the Committee on Public Works, U. S. Senate, 85th Cong., 1st Sess. (1957).

the petitioner, Blaier, and Chapman were indicted in adjoining Marion County on this transaction.[7]

It is apparent from the questioning of Raddock by the chief counsel for the McClellan Committee that the Committee had information indicating that Raddock, the petitioner, Blaier, and several officials of the Teamsters Union had been involved in a plan whereby Holovachka had been induced to drop the Lake County grand jury investigation, and Committee counsel explained to Raddock that the Committee was interested to learn whether union funds or influence had been used for that purpose.[8]

In addition to Raddock, whose self-incrimination plea with respect to all questions relating to that episode was respected by the Committee, Blaier, and two witnesses connected with an Indiana Local of the Teamsters Union, Michael Sawochka its secretary-treasurer and Joseph P. Sullivan its attorney, were also examined before the Committee on June 26. Sawochka and Sullivan each refused to answer any questions relating to the termination of the Lake County grand jury proceedings, Sawochka basing his refusal on the Fifth Amendment privilege against self-incrimination, and Sullivan invoking the attorney-client privilege insofar as the questions related to any discussions with Sawochka. Both claims were honored by the Committee.

Blaier, who was asked no questions regarding the Lake County real estate transaction itself,[9] refused to answer the question whether he had made "any arrangements for

---

[7] The Government's brief informs us that petitioner and his two codefendants, Blaier and Chapman, were convicted on the Marion County indictment in November 1960, and that the conviction is now pending on appeal in the Supreme Court of Indiana.

[8] Note 17, *infra*.

[9] A copy of the state indictment was accepted for reference, and the Chairman announced that it was a "rule or policy" of the Committee not to interrogate about matters for which the witness was under pending state indictment. Hearings, 12060.

Mr. Max Raddock to fix any case for you in Indiana." He asserted that the question "relates solely to a personal matter, not pertinent to any activity which this committee is authorized to investigate and . . . it might aid the prosecution in the case in which I am under indictment." The Committee Chairman, without ruling on the objection, stated that the witness might claim the privilege against self-incrimination. Although Blaier did not thereafter do so, he was never directed by the Committee to answer this question.[10]

The last witness who was examined by the Committee on this phase of its investigation was the petitioner, who was called on June 27. He answered questions concerning the publication by Raddock of the biography of petitioner's father, commissioned by the Carpenters Union at a total expense of $310,000. When the inquiry turned to the subject of the Lake County grand jury investigation, however, petitioner refused to answer any questions. Being under the same indictment as Blaier and represented by the same counsel, petitioner's grounds for refusal were the same as those which had been advanced the day before by Blaier: "it [the question] relates solely to a personal matter, not pertinent to any activity which this committee is authorized to investigate, and also it

---

[10] The Committee's chief counsel stated that the question did not relate to the subject matter of the state indictment but "to steps taken in a later conspiracy to present [prevent?] an indictment in Lake County, Ind." Hearings, 12074. Blaier's attorney argued that the answer could be used by the prosecution in the Indiana case to prove the continuation of the conspiracy. Whether the question involved the state indictment or not, the Committee's counsel conceded that Blaier might "not want to answer the questions on the grounds it may tend to incriminate him, but not because he is under indictment or that I am asking questions dealing with the indictment." The chairman ruled, "It may be a borderline case. I am unable to determine it at this time. The witness can exercise his privilege." Hearings, 12074.

relates or might be claimed to relate to or aid the prosecution in the case in which I am under indictment and thus be in denial of due process of law." [11]   No claim of the Fifth Amendment privilege against self-incrimination was made at any stage.   This objection, upon which the petitioner stood throughout this phase of his interrogation, was overruled by the Committee, and petitioner was directed, and refused to answer, each of the 18 questions constituting the subject matter of the indictment upon which he has been convicted.[12]

---

[11] Hearings, 12115.

[12] *Count 1:* "Has he [Mr. Raddock] received from the union payment for acts performed in your behalf and for you as an individual?" *Count 2:* "Have you, unrelated to this offense charged in the indictment now against you, engaged the services of Mr. Raddock, and have you paid him out of union funds for the performance of those services, to aid and assist you in avoiding or preventing an indictment from being found against you or for being criminally prosecuted for any other offense other than that mentioned in this indictment?" *Count 3:* "Did you engage the services of Mr. Raddock and pay him for those services out of union funds, to contact, either directly or indirectly, the county prosecuting attorney, Mr. Holovachka, given name Metro, in Lake County, Gary, Ind.?" *Count 4:* "Have you paid Max C. Raddock out of union funds for personal services rendered to you at any time within the past 5 years?" *Count 5:* "Have you used union funds to pay Max C. Raddock for any services rendered to you personally, wholly disassociated from any matters out of which the pending criminal charge arose?" *Count 6:* "Was he there [in Chicago] on union business for which the union had the responsibility for payment?" *Count 7:* "Was Mr. Raddock paid on that trip, the expenses of his paid by union funds while he was on union business?" *Count 8:* "You were out in Chicago at the same time?" *Count 9:* "Were your expenses on that Chicago trip paid by the union?" *Count 10:* "Were you out in Chicago at that time on union business?" *Count 11:* "Do you know Mr. James Hoffa?" *Count 12:* "Did you make an arrangement with Mr. Hoffa that he was to perform tasks for you in return for your support on the question of his being ousted from the A. F. L.–CIO?" *Count 13:* "Isn't it a fact that you telephoned Mr. Hoffa from your hotel in Chicago on August 12, 1957?" *Count 14:* "And wasn't that tele-

The many arguments now made to us in support of reversal are reducible to two constitutional challenges. First, it is contended that questioning petitioner on any matters germane to the state criminal charges then pending against him was offensive to the Due Process Clause of the Fifth Amendment. Second, it is argued that the Committee invaded domains constitutionally reserved to the Executive and the Judiciary, in that its inquiry was simply aimed at petitioner's "exposure" and served no legislative purpose. For reasons now to be discussed we decide that neither challenge is availing.

## I.

### Due Process.

The Committee's interrogation is said to have been fundamentally unfair in two respects: (1) it placed the petitioner in a position where, save for silence, his only choice lay between prejudicing his defense to the state indictment, and committing perjury; and (2) it was a "pretrial" of the state charges before the Committee. The first of these propositions rests on two premises respecting Indiana law, which we accept for the purposes of the ensuing discussion: admissions of an attempt to "fix" the grand jury investigation could have been used against petitioner in the state trial as evidence of consciousness of guilt (see, e. g., *Davidson* v. *State*, 205 Ind. 564, 569, 187 N. E. 376, 378); a claim of the federal self-

phone call in fact paid out of union funds, the telephone call that you made to him on August 12?" *Count 15:* "Do you also know Mr. Sawochka of the Brotherhood of Teamsters?" *Count 16:* "Isn't it a fact that you had Mr. Plymate who is a representative of the brotherhood, telephone, and your secretary telephone, Mr. Sawochka from your room on August 13, 1957?" *Count 17:* "And isn't it a fact that that telephone bill and that telephone call was paid out of union funds?" *Count 18:* "Did you have any business with local 142 of the Teamsters in Gary, Ind.?"

incrimination privilege before that Committee could also have been so used, at least to impeach petitioner's testimony had he taken the stand at the state trial (see *Crickmore* v. *State,* 213 Ind. 586, 592–593, 12 N. E. 2d 266, 269).

The contention respecting Indiana's future use of incriminatory answers at once encounters an obstacle in *Hale* v. *Henkel,* 201 U. S. 43, and *United States* v. *Murdock,* 284 U. S. 141. Those cases establish that possible self-incrimination under state law is not a ground for refusing to answer questions in a federal inquiry; accordingly, the Fifth Amendment privilege against self-incrimination will not avail one so circumstanced. Manifestly, this constitutional doctrine is no less relevant here either because the petitioner was actually under, and not merely threatened with, state indictment at the time of his appearance before the Committee, or because of the likelihood that the Committee would have respected, even though not required to do so under existing law, a privilege claim had one been made.

Recognizing this obstacle, petitioner asks us to overrule *Hale* and *Murdock,* asserting that both decisions rested on misapprehensions as to earlier American and English law.[13] But we need not consider those conten-

---

[13] Among other things, petitioner contends that both *Hale* v. *Henkel* and *United States* v. *Murdock* were founded on a misreading of an earlier decision of this Court, *United States* v. *Saline Bank,* 1 Pet. 100, which was delivered by Chief Justice Marshall. It is argued that *Saline Bank* stands for the proposition that the constitutional privilege against self-incrimination may be invoked in a federal court if the information divulged may aid a state prosecution. It is abundantly clear, however, that *Saline Bank* stands for no constitutional principle whatever. It was merely a reassertion of the ancient *equity rule* that a court of equity will not order discovery that may subject a party to criminal prosecution. In fact, the decision was cited in support of that proposition by an esteemed member of the very Court that decided the case. 2 Story, Commentaries on Equity, § 1494, n. 1 (1836).

tions, for petitioner never having claimed the Fifth Amendment privilege before the Committee, this aspect of his due process challenge is not open to him now. This is not a case like *Quinn* v. *United States*, 349 U. S. 155, or *Emspak* v. *United States*, 349 U. S. 190, where there is doubt whether that privilege was invoked by the witness. "If," as was noted in *Emspak*, at 195, "the witness intelligently and unequivocally waives any objection based on the Self-Incrimination Clause, or if the witness refuses a committee request to state whether he relies on the Self-Incrimination Clause, he cannot later invoke its protection in a prosecution for contempt for refusing to answer that question." In this instance, the petitioner, with counsel at his side, unequivocally and repeatedly disclaimed any reliance on the Fifth Amendment privilege.[14]

---

[14] Typical of such disclaimers are the following:

"The CHAIRMAN. I understand, it very clear now, that you are not invoking the fifth amendment privilege?

"Mr. HUTCHESON. That is right, sir, I am not invoking it.

"The CHAIRMAN. You are not exercising that privilege?

"Mr. HUTCHESON. No, sir.

"The CHAIRMAN. You are challenging the question and the jurisdiction of the committee for the reasons you have stated and for those reasons only?

"Mr. HUTCHESON. Yes, sir.

"The CHAIRMAN. All right. We have a clear understanding about that." Hearings, 12116.

"The CHAIRMAN. And, again, not invoking the privilege of the fifth amendment, you stand only and solely upon the statement you have read?" [See pp. 605–606, *supra.*]

"Mr. HUTCHESON. Yes, sir.

"The CHAIRMAN. And you are not exercising the privilege that, by answering, a truthful answer might tend to incriminate you?

"(Witness conferred with counsel.)

"Mr. HUTCHESON. No, sir." Hearings, 12117.

Further disclaimers of the same tenor will be found at Hearings, 12119, 12121–12122, and 12124. Petitioner did not explain at the

Petitioner cannot escape the effect of his waiver by arguing, as he does, that his refusals to answer were based on "due process" grounds, and not upon a claim of "privilege." We agree, of course, that a congressional committee's right to inquire is "subject to" *all* relevant "limitations placed by the Constitution on governmental action," including "the relevant limitations of the Bill of

---

hearings why he went to such pains to avoid any appearance of invoking the privilege against self-incrimination. However, the following colloquy between petitioner and a member of the Committee sheds some light on his motivation:

"Senator ERVIN. Mr. Chairman, may I ask one or two questions along that line and then I will subside?

"Mr. Hutcheson, you are familiar with the provisions of the AFL–CIO ethical code concerning officers of affiliated unions who invoke the fifth amendment; aren't you?

"Mr. HUTCHESON. Yes, sir.

"Senator ERVIN. In that connection I would like to state that this is my opinion of the law, though it may not be your counsel's. The only reason for recognizing the right that a man may not testify concerning matters involved in an indictment against him arises out of the fact that the indictment is probably the strongest kind of evidence that anything he may say in reference to it may be construed to incriminate him, and that the only reason that a man has a right to refrain from answering matters about an indictment is the fact that what he may say about those matters may tend to incriminate him.

"Therefore, Mr. Hutcheson, don't you realize that what you are doing is that you are seeking to avoid an expressed violation? In other words, you are seeking to get the benefit of the fifth amendment without invoking it so that you will not run the risk of committing an offense against the ethical code of the A. F. of L.–CIO?

"(The witness conferred with his counsel.)

"Mr. HUTCHESON. Sir, I have been following the advice of counsel on the grounds outlined by me.

"Senator ERVIN. Well, you are concerned that there shall be no actual or apparent violation on your part of the provisions of the A. F. of L.–CIO code of ethics concerning union officers who invoke the fifth amendment when asked about their official conduct, aren't you?

"Mr. HUTCHESON. Yes, sir." Hearings, 12124–12125.

Rights," *Barenblatt* v. *United States*, 360 U. S. 109, 112; that such limitations go beyond the protection of the self-incrimination clause of the Fifth Amendment, *id.*, 111–112, and that nonreliance on one such limitation does not preclude reliance on another. But it is surely equally clear that where, as here, the validity of a particular constitutional objection depends in part on the availability of another, both must be adequately raised before the inquiring committee if the former is to be fully preserved for review in this Court.

To hold otherwise would enable a witness to toy with a congressional committee in a manner obnoxious to the rule that such committees are entitled to be clearly apprised of the grounds on which a witness asserts a right of refusal to answer. *Emspak* v. *United States, supra,* at 195; cf. *Barenblatt* v. *United States, supra,* at 123–124. The present case indeed furnishes an apt illustration of this. Pursuant to its policy of respecting Fifth Amendment privilege claims with respect to "state" self-incrimination (even though with *Hale* and *Murdock* still on the books it need not have done so), the Committee was at pains to discover whether petitioner's due process objection included a privilege claim. Had he made such a claim, there is little doubt but that the Committee would have honored it. It was only after petitioner's express disclaimer of the privilege that the Committee proceeded to disallow his due process objection. Now to consider that the self-incrimination aspect of petitioner's due process claim is still open to him would in effect require us to say that, despite petitioner's unequivocal disclaimer, the Committee should nonetheless have taken his due process objection as subsuming also a privilege claim.[15] We cannot so consider the situation.

---

[15] While the Committee did not press Blaier to answer questions relating to the Lake County grand jury proceedings after he had refused to do so on the same grounds as those advanced by the peti-

We also find untenable the contention that possible use in the state trial of a claim of the federal privilege against self-incrimination either excused petitioner from asserting it before the Committee or furnishes independent support for his due process challenge. Whether or not, as is intimated by the Government, but, for obvious reasons, not by the petitioner, the State's use of such a claim directly or for impeachment purposes might be preventable, need not now be considered. For if such a proposition is arguable in the face of *Twining* v. *New Jersey*, 211 U. S. 78, and *Adamson* v. *California*, 332 U. S. 46, 51, let alone *Knapp* v. *Schweitzer*, 357 U. S. 371; *Feldman* v. *United States*, 322 U. S. 487; *Hale* v. *Henkel, supra*, and *United States* v. *Murdock, supra*, its consideration should in any event await another day. The appropriate time for that, had the petitioner in this instance claimed the privilege before the Committee, would have been upon review of his state conviction, when we would have known exactly what use, if any, the State had made of the federal claim. To thwart the exercise of legitimate congressional power, on the basis of conjecture that a State may later abuse an individual's reliance upon federally assured rights, would require of us a constitutional adjudication contrary to well-established principles of ripeness and justiciability. Cf. *United Public Workers* v. *Mitchell*, 330 U. S. 75, 89–90.

There remains for discussion on the due process challenge, the contention that the Committee's inquiry was a "pretrial" of the state indictment. Insofar as this proposition suggests that the congressional inquiry infected the later state proceedings, the answer to it is found in what we have just said respecting the conten-

---

tioner, there is nothing to indicate that this resulted from the Committee's understanding that those grounds included a claim of the Fifth Amendment privilege.

tion that a claim of self-incrimination before the Committee could have been used in the state proceedings. If the Committee's public hearings rendered petitioner's state trial unfair, such a challenge should not be dealt with at this juncture. The proper time for its consideration would be on review of the state conviction. To determine it now would require us to pass upon the claim in the dark, since we are entirely ignorant of what transpired at the state trial.

Nor can it be argued that the mere pendency of the state indictment *ipso facto* constitutionally closed this avenue of interrogation to the Committee. "It may be conceded that Congress is without authority to compel disclosures for the purpose of aiding the prosecution of pending suits; but the authority of that body, directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits." *Sinclair* v. *United States,* 279 U. S. 263, 295. It would be absurd to suggest that in establishing this committee the Congress was actuated by a purpose to aid state prosecutions, still less that of this particular individual. The pertinency of the observation in *Sinclair* is not lessened by the circumstance that in this instance the state proceeding involved was criminal, rather than civil. Cf. *Delaney* v. *United States,* 199 F. 2d 107, 114.[16]

---

[16] The suggestion made in dissent that the questions which petitioner refused to answer were "outside the power of a committee to ask" (*post,* p. 638) under the Due Process Clause because they touched on matters then pending in judicial proceedings cannot be accepted for several reasons. *First:* The reasoning underlying this proposition is that these inquiries constituted a legislative encroachment on the judicial function. But such reasoning can hardly be limited to inquiries that may be germane to *existing* judicial proceedings; it would surely apply as well to inquiries calling for answers that might be used to the prejudice of the witness in any *future* judicial

## II.

### *Exposure.*

There is also no merit to petitioner's contention that the Committee undertook simply "to expose" petitioner "for the sake of exposure," *Watkins* v. *United States,* 354 U. S. 178, 200. The origins of the McClellan Committee, and the products of its endeavors, both belie that challenge, and nothing in the record of the present hearings points to a contrary conclusion.

It cannot be gainsaid that legislation, whether civil or criminal, in the labor-management field is within the competence of Congress under its power to regulate inter-

proceeding. If such were the reach of "due process" it would turn a witness' privilege against self-incrimination into a self-operating restraint on congressional inquiry, see 8 Wigmore, Evidence (3d ed.), § 2268; p. 20, *infra,* and would in effect *pro tanto* obliterate the need for that constitutional protection.

*Second:* The only decision relied on in support of this broad proposition is *Kilbourn* v. *Thompson,* 103 U. S. 168, which because of its "loose language" has been severely discredited, *e. g., United States* v. *Rumely,* 345 U. S. 41, 46, and which cannot well be taken to stand for the pervasive principles for which it is presently relied on. (*Post,* pp. 630, 632–636.) At most, *Kilbourn* is authority for the proposition that Congress cannot constitutionally inquire "into the private affairs of individuals who hold no office under the government" when the investigation "could result in no valid legislation on the subject to which the inquiry referred." 103 U. S., at 195. The tangible fruits of the labors of the McClellan Committee (pp. 615–617, *infra*) show that such is not the case here.

*Third:* It hardly seems an impairment of "individual liberties protected by the Bill of Rights" (*post,* p. 630) to limit a witness who makes such a "due process" objection to the scope of the privilege against self-incrimination granted by the Fifth Amendment. If neither the Due Process Clause of the Fourteenth Amendment prohibits the State from using the witness' answer nor the Self-Incrimination Clause of the Fifth Amendment prohibits the Federal Government from asking the question, it is difficult to understand

state commerce. The Committee's general legislative recommendations, made at the conclusion of its First Interim Report, S. Rep. No. 1417, 85th Cong., 2d Sess. 450–453 (1958), were embodied in two remedial statutes enacted by Congress: the Welfare and Pension Plans Disclosure Act of 1958, 72 Stat. 997, and the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519. The enactment of the first of these statutes is attributable primarily to the findings and recommendations of several Subcommittees of the Senate Committee on Labor and Public Welfare, S. Rep. No. 1440, 85th Cong., 2d Sess. 2–3 (1958). But passage of the bill was stimulated by the information then being gathered at hearings of the McClellan Committee. See 104 Cong. Rec. 7054, 7197–7198, 7233, 7337–7338, 7483, 7509–7510, 7521 (1958).

---

how it can be said that the Due Process Clause of the Fifth Amendment prohibits the inquiry because any answer *may* be used by a State.

*Fourth:* It should be noted that although this congressional inquiry was *related* to the subject matter of the state indictment, the questions that were asked of the petitioner did not bear directly on his guilt or innocence of the state charges. Indiana's concern was not with whether union funds or influence had been misused; indeed there is no suggestion that the alleged bribery of the Indiana highway official was consummated with funds other than the personal profits reaped by the petitioner and others from their unlawful transactions. On the other hand, Congress' concern was whether, on some later date, union funds had been used to stifle criminal proceedings that had been brought against the petitioner personally. How such payments were made, if they were in fact made, would certainly be a consideration in the establishment of a federal reporting and disclosure system for union funds.

Finally, "the least possible power adequate to the end proposed" phrase in *Anderson* v. *Dunn*, 6 Wheat. 204, 231 (*post*, pp. 632, 636, 638) scarcely bears upon the issue presented by this case. That expression was used in the *Anderson* case not in connection with anything having to do with the permissible scope of congressional inquiry, but solely with respect to "the extent of the punishing power" inherently possessed by the Congress. *Id.*, at 230–231.

The Labor-Management Reporting and Disclosure Act of 1959 was a direct response to the need for remedial federal legislation disclosed by the testimony before the McClellan Committee. This is made clear not by imprecise inferences drawn from legislative history; the proof is in the statute itself. Section 2 (b) of the Act declares it to be a finding of Congress "from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation." 73 Stat. 519. The Senate and House Reports lean heavily on findings made by the McClellan Committee to justify particular provisions in the proposed bills. See S. Rep. No. 187, 86th Cong., 1st Sess. 2, 6, 9, 10, 13–17 (1959); H. R. Rep. No. 741, 86th Cong., 1st Sess. 1, 2, 6, 9, 11–13, 76, 83 (1959).

The resolution which gave birth to this Committee, when considered in light of the fruits of its labors, proves beyond any doubt "that the committee members . . . [were] serving as the representatives of the parent assembly in collecting information for a legislative purpose." *Watkins* v. *United States, supra,* at 200. This is not a case involving an indefinite and fluctuating delegation which permits a legislative committee "in essence, to define its own authority, to choose the direction and focus of its activities." *Id.,* at 205. This Committee was directed to investigate "criminal or other improper practices . . . in the field of labor-management relations." Deciding whether acts that are made criminal by state law ought also to be brought within a federal prohibition, if, as here, the subject is a permissible one for federal regulation, turns entirely on legislative inquiry. And it is this inquiry in which the Senate was engaged when it assigned the fact-finding duty to the Select Committee

on Improper Activities in the Labor or Management Field.

Moreover, this record is barren of evidence indicating that the Committee, for reasons of its own, undertook to "expose" this petitioner.

*First:* The transcript discloses a most scrupulous adherence to the announced Committee policy of not asking a witness under state indictment any questions "on the subject matter involved in the indictment." Note 9, *supra.* This particular indictment related solely to activity in which petitioner and others had been engaged in their individual capacities, not on behalf of any labor organization. The Committee's concern was not whether petitioner had in fact defrauded the State of Indiana of $78,000 in concluding a dishonest sale or whether he had personally corrupted a state employee. Its interest, which was entirely within the province entrusted to it by the Senate, was to discover whether and how funds of the Brotherhood of Carpenters or of the Teamsters Union [17] had been used in a conspiracy to bribe a state prosecutor to drop charges made against individuals who were also officers of the Brotherhood of Carpenters, and whether the influence of union officials had been exerted to that end. If these suspicions were founded, they would have supported remedial federal legislation for the future, even though they might at the same time have warranted a separate state prosecution for obstruction of justice, or

---

[17] The Committee had information tending to show that the Teamsters Union, with whose officers petitioner was friendly, purchased for $40,000 some real estate in Gary, Indiana, worth approximately $3,800. The seller in this transaction was a corporation which then proceeded to purchase Holovachka's interest in another failing corporation for an amount substantially in excess of its value. See Second Interim Report of the Select Committee on Improper Activities in the Labor or Management Field, S. Rep. No. 621, pt. 2, 86th Cong., 1st Sess. 558–560 (1959).

been usable at the trial of the Marion County indictment as evidence of consciousness of guilt.  *Supra,* pp. 607–608. But surely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding, *Sinclair* v. *United States, supra,* at 295, or when crime or wrongdoing is disclosed, *McGrain* v. *Daugherty,* 273 U. S. 135, 179–180.

*Second:* The information sought to be elicited by the Committee was pertinent to the legislative inquiry.  The Committee was investigating whether and how union funds had been misused, in the interest of devising a legislative scheme to deal with irregular practices.  Because of petitioner's refusal to answer questions, and because of the similar refusal by other witnesses to testify with regard to the Lake County grand jury proceedings, the Committee was not able to learn whether union funds or influence had been used to persuade Holovachka to drop those proceedings.

Petitioner contends that the Committee's finding in its Second Interim Report that Raddock had been "used by Hutcheson as a fixer in an attempt to head-off the indictment of Hutcheson [and others] . . ." shows that his testimony was not needed for any purpose other than to prejudice or embarrass him.  But this overlooks the fact that the Committee had been able to obtain no information whatever on the Lake County grand jury proceedings from any of the other witnesses by reason of their refusals to testify on the subject.[18]  Moreover, it does not lie with

---

[18] The meagerness of the Committee's finding on this subject stands in marked contrast to its findings on the Hutcheson biography, with respect to which the petitioner and the other witnesses had testified with comparative freedom.  Whereas 17 pages of the Second Interim Report are devoted to summarizing the evidence regarding the publication of the biography, only six pages related to the Lake County

this Court to say when a congressional committee should be deemed to have acquired sufficient information for its legislative purposes.

*Third:* The Committee's interrogation was within the express terms of its authorizing resolution. If the Committee was to be at all effective in bringing to Congress' attention certain practices in the labor-management field which should be subject to federal prohibitions, it necessarily had to ask some witnesses questions which, if truthfully answered, might place them in jeopardy of state prosecution. Unless interrogation is met with a valid constitutional objection "the scope of the power of [congressional] inquiry . . . is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution." *Barenblatt* v. *United States, supra,* at 111. And it is not until the question is asked that the interrogator can know whether it will be answered or will be met with some constitutional objection. To deny the Committee the right to ask the question would be to turn an "option of refusal" into a "prohibition of inquiry," 8 Wigmore, Evidence (3d ed.) § 2268, and to limit congressional inquiry to those areas in which there is not the slightest possibility of state prosecution for information that may be divulged. Such a restriction upon congressional investigatory powers should not be countenanced.

The three episodes upon which the petitioner relies as evidencing a Committee departure from these legitimate congressional concerns fall far short of sustaining what is sought to be made of them. The first of these is the

proceedings. Second Interim Report of the Select Committee on Improper Activities in the Labor or Management Field, S. Rep. No. 621, pt. 2, 86th Cong., 1st Sess. 533–550, 554–560 (1959). It is relevant to observe in this regard that ten of the questions with respect to which the petitioner was subsequently indicted related to the possible use of union funds for the purpose of suppressing the Lake County grand jury proceeding. See note 12, Counts 1, 2, 3, 4, 5, 6, 7, 9, 14, 17.

Committee counsel's statement at the outset of the hearings explaining "the subject matter being inquired into," in the course of which he referred to the real estate transaction involved in the Marion County indictment, and explained the Committee's interest in finding out whether union funds or influence had been used in bringing to an end the Lake County grand jury investigation of the matter.[19] The propriety of such an inquiry has already been discussed. Pp. 617–618, *supra*.

The second episode is the Chairman's statement to the effect that all the facts as to the Lake County proceedings had "not been developed by the committee"; that further "exposure" of them "should be made"; and that the

---

[19] In relevant part this statement was:

"We are inquiring into the situation in connection with the presentation before the grand jury in Lake County, Ind.; the intervention by certain union officials into that matter, and the part that was played by Mr. Hutcheson himself, Mr. Sawochka, the secretary-treasurer of local 142 of the Teamsters, and Mr. James Hoffa, the international president of the Teamsters.

"The CHAIRMAN. Is there some information that either union funds were used in the course of these transactions or that the influence of official positions of high union officials was used in connection with this alleged illegal operation?

"Mr. KENNEDY. We have information along both lines, Mr. Chairman, not only the influence but also in connection with the expenditure of union funds.

.          .          .          .

"The CHAIRMAN. That is the interest of this committee in a transaction of this kind or alleged transaction of this kind, to ascertain again whether the funds or dues money of union members is being misappropriated, improperly spent, or whether officials in unions are using their position to intimidate, coerce, or in any way illegally promote transactions where the public interest is involved.

"Mr. Raddock, you have heard a background statement. That is not evidence, but it is information, however, which the committee has, regarding this matter out there. The committee is undertaking to inquire into this in pursuit of the mandate given to it by the resolution creating the committee." Hearings, 12021.

Committee stood ready to "assist and help" Indiana if it chose to interest itself in the matter.[20] We can see nothing in this statement, which was made after the Committee's inquiry had ended, beyond a perfectly normal offer on the part of the Chairman to put the Committee transcript at the disposal of the Indiana law enforcement authorities if they wished to avail themselves of it.[21]

The final occurrence is the so-called Committee "finding" as to petitioner's alleged use of Raddock as a "fixer" to "head-off" an indictment by the Lake County grand jury. Whatever the basis for that "finding" (cf. note 18, *supra*), we must say that its mere inclusion in an official report to the Senate of the Committee's activities [22] fur-

---

[20] The full statement was:

"The testimony further indicates that certain high officials of both the Teamsters and the Carpenters Union, two of the largest unions in the country, with the help and assistance of Mr. Raddock were involved in a conspiracy to subvert justice in the State of Indiana.

"All the facts regarding this conspiracy undoubtedly have not been developed by the committee.

"Further exposure we believe can and should be made. We will be glad to assist and help law enforcement officials in the State of Indiana if they determine that they would interest themselves in the matter." Hearings, 12132.

[21] At the contempt trial Senator McClellan explained his statement as follows:

"Our legislative function had been performed in seeking information regarding crimes and improper activities. Some evidence had been presented indicating the possibility of a further crime involving this defendant possibly and officers of another large union. It has been our practice to cooperate with state and federal officials where any evidence is developed before us with respect to a crime having been committed. Our legislative purpose is to search out and find if crime has been committed.

"My statement here is to the effect that if the state officials desired to pursue any testimony that we had developed, we would cooperate with them and make the record available to them."

[22] Second Interim Report, S. Rep. No. 621, pt. 2, 86th Cong., 1st Sess. 592 (1959).

nishes a slender reed indeed for a charge that that Committee was engaged in unconstitutional "exposure."

In conclusion, it is appropriate to observe that just as the Constitution forbids the Congress to enter fields reserved to the Executive and Judiciary, it imposes on the Judiciary the reciprocal duty of not lightly interfering with Congress' exercise of its legitimate powers. Having scrutinized this case with care, we conclude that the judgment of the Court of Appeals must be

*Affirmed.*

MR. JUSTICE BLACK and MR. JUSTICE FRANKFURTER took no part in the decision of this case.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, concurring in the result.

I join in the judgment affirming the Court of Appeals, but not in my Brother HARLAN's opinion.

The Select Committee assured petitioner that it would respect his reliance upon his Fifth Amendment privilege against self-incrimination, but petitioner deliberately and explicitly chose not to exercise that privilege. In that circumstance, the case is not one for reconsideration of *Hale* v. *Henkel,* 201 U. S. 43, and *United States* v. *Murdock,* 284 U. S. 141. I adhere, however, to my view that in a proper case we should reconsider the holdings of *Hale* and *Murdock* that, in a federal proceeding, possible incrimination under state law presents no basis for invoking the Fifth Amendment privilege. See *Knapp* v. *Schweitzer,* 357 U. S. 371, 381 (concurring opinion); see also *Cohen* v. *Hurley,* 366 U. S. 117, 154 (dissenting opinion).

The petitioner's constitutional claims find no support, in my view, in *Kilbourn* v. *Thompson,* 103 U. S. 168.

That case involved a congressional inquiry into the settlement of a claim against a bankrupt firm. The settlement was said to threaten depletion of the bankrupt estate to the injury of other creditors, including the United States. The Court held that the subject matter was outside legislative cognizance because it was a matter inherently and historically for adjustment by the judicial branch, and because there was no hint of a legislative purpose to be served by the inquiry—"it could result in no valid legislation on the subject to which the inquiry referred." 103 U. S., at 195.

The congressional inquiry before us here is in sharp contrast to that in *Kilbourn*. The Select Committee was seeking factual material to aid in the drafting and adopting of remedial legislation to curb misuse by union officials of union funds—unquestionably a proper legislative purpose. The pending Marion County indictment did not involve misuse of union funds but the alleged bribery of a state official in connection with a sale of land to the State. However, the congressional inquiry and the state prosecution crossed paths when the Committee learned that union funds might have been used in a corrupt attempt to forestall an earlier indictment in another county, Lake, for the same alleged bribery. It seems to me obvious that the Committee's interrogation of the petitioner about the use of union funds to forestall that indictment did not stray beyond the range of the Committee's valid legislative purpose. It may be that, under Indiana law, evidence of the attempt, although not essential, would be admissible at the trial under the Marion County indictment.[1] But this hardly converts the Com-

---

[1] We are informed that the petitioner was convicted under the indictment at a trial held some 29 months after his appearance before the Committee, but we are not informed whether the Committee proceedings were part of the State's proofs or otherwise affected the trial. Clearly, however, any contention as to unfairness in his state trial must abide review of that conviction.

mittee's inquiry about the attempt into a legislative rehearsal of the trial of the Marion County indictment, bringing the inquiry within *Kilbourn's* condemnation of legislative usurpation of judicial functions.

When a congressional inquiry and a criminal prosecution cross paths, Congress must accommodate the public interest in legitimate legislative inquiry with the public interest in securing the witness a fair trial. Whether a proper accommodation has been made must be determined from the vantage point of the time of petitioner's appearance before the Committee.

Any thought that some of our recent decisions, *e. g.*, *Barenblatt* v. *United States*, 360 U. S. 109; *Wilkinson* v. *United States*, 365 U. S. 399; *Braden* v. *United States*, 365 U. S. 431, weakened the vitality of our holding in *Watkins* v. *United States*, 354 U. S. 178, 187, that the congressional power of inquiry is not "an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress," is dispelled by today's strong expression of continued adherence to that vital principle. Investigation conducted solely to aggrandize the investigator or punish the investigated, either by publicity or by prosecution, is indefensible—it exceeds the congressional power: exposure for the sake of exposure is not legislative inquiry.

"[T]he power to investigate must not be confused with any of the powers of law enforcement . . . ." *Quinn* v. *United States*, 349 U. S. 155, 161; see *United States* v. *Icardi*, 140 F. Supp. 383. On the other hand, so long as the subject matter is not in "an area in which Congress is forbidden to legislate," *Quinn, supra*, at 161, the mere fact that the conduct under inquiry may have some relevance to the subject matter of a pending state indictment cannot absolutely foreclose congressional inquiry. Surely it cannot be said that a fair criminal trial and a full power of inquiry are interests that defy accommodation. The

courts, responsible for protecting both these vital interests, will give the closest scrutiny to assure that indeed a legislative purpose was being pursued and that the inquiry was not aimed at aiding the criminal prosecution. Even within the realm of relevant inquiry, there may be situations in which fundamental fairness would demand postponement of inquiry until after an immediately pending trial, or the taking of testimony in executive session— or that the State grant a continuance in the trial. On what is before us now, I think that the facts fail to show that this inquiry was unable to proceed without working a serious likelihood of unfairness. Examining the challenged questioning in the full context of the congressional inquiry and its relevance to legislation in process, leads me to conclude that petitioner was not questioned for exposure's sake.

The Select Committee began its hearings in 1957. The Committee engaged from the start in gathering facts which led to the conclusion that legislation requiring labor organizations to report and disclose various matters about their operation was necessary. The Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, resulted. Many features of that statute stem from facts learned by the Select Committee's examination into the affairs of several labor organizations, though the drafting was the work of the Senate Subcommittee on Labor and the House Subcommittee on Labor-Management Relations.[2] The Subcommittees and their parent Standing Committees framed the statute after considering the Select Committee's findings. See, e. g., S. Rep. No. 1684, 85th Cong., 2d Sess. 1 (1958); S. Rep. No. 187, 86th Cong., 1st Sess. 2 (1959); H. R. Rep. No. 741, 86th Cong., 1st

---

[2] The Select Committee's membership throughout included two members of the Senate Subcommittee on Labor, Senators Kennedy and Goldwater, who participated actively in the work of both Committees.

Sess. 1 (1959); see also S. Doc. No. 10, 86th Cong., 1st Sess. 1 (1959). The bills reported out by those Committees recited that their purpose was "[t]o provide for the reporting and disclosure of certain financial transactions and administrative practices of labor organizations and employers, to prevent abuses in the administration of trusteeships by labor organizations, to provide standards with respect to the election of officers of labor organizations . . . ." The second paragraph of the Preamble to the bills included the following: "The Congress further finds, from recent investigations in the labor and management fields, that there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation . . . ." S. 1555 and H. R. 8342, 86th Cong., 1st Sess. (1959); see also S. 3974, 85th Cong., 2d Sess. (1958).

At the opening of the Select Committee's hearings on February 26, 1957, the Chairman, Senator McClellan, noted petitioner's union as one of those that the Committee intended to investigate. Hearings, 2. Although the Committee's hearings during the 16 months before they reached petitioner were very full, they had touched upon the affairs of only a few unions, and petitioner's was only the fourth union inquired into with a particular view toward discovering modes of misusing union funds. See Hearings, at 2581, 3221, 7512, and 11786. Petitioner was subpoenaed on May 20, 1958, to appear before the Committee on June 2; his own appearance was put off to June 27, although testimony of other witnesses was taken commencing on June 4. Three months before he was subpoenaed, the state indictment against him was handed up, on February 18, 1958. He was not tried until November 1960, about 29 months after his appearance before the Committee. At the time he appeared, the question-

ing was directly relevant to the Committee's efforts to inform itself and Congress and to secure legislation within congressional power to enact, aimed at correcting just such evils as those about which petitioner was questioned. Earlier in June 1958, a labor-management reporting and disclosure bill, the Kennedy-Ives Bill, was reported out by the Senate Committee on Labor and Public Welfare and passed by the Senate, but in August it failed of passage in the House. 104 Cong. Rec. 10657, 11486–11487, 18287–18288. Therefore a bill was reintroduced on January 20, 1959, now known as the Kennedy-Ervin Bill. In introducing it, Senator Kennedy read a letter from ex-Senator Ives which said: "[The bill] is designed to meet the objectives set forth in the report of the Senate Select Committee on Improper Activities in the Labor or Management Field." 2 N. L. R. B., Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 968. The Senate Subcommittee on Labor then conducted intensive hearings on that and alternative bills.[3] In opening those hearings, Senator Kennedy said "We expect further recommendations from the McClellan committee in its second annual report, and we expect to have the advice of an expert panel on labor law revision which will form the basis of further hearings and another bill later this year."[4] Reliance on the work of the Select Committee was evident and significant in those hearings. Hearings before the House Subcommittee began after the conclusion of the hearings by the Senate Subcommittee, and continued into June.[5] Spirited debate over the

---

[3] Hearings before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, on Labor-Management Reform Legislation, 86th Cong., 1st Sess. (January through March 1959).

[4] Id., at 40–41.

[5] Hearings before a Joint Subcommittee of the House Committee on Education and Labor, on Labor-Management Reform Legislation, 86th Cong., 1st Sess. (March through June 1959).

merits of the proposed legislation continued throughout that session of Congress until enactment as the Act of September 14, 1959, Pub. L. 86–257. Section 2 (b) of the declaration of findings, purposes, and policy incorporates the above-quoted findings of the second paragraph of the Kennedy-Ervin Bill. It was not until 14 months after passage that petitioner was tried.

The questioning of petitioner comes into focus against this background of an inquiry begun by the Select Committee more than a year before petitioner's indictment and continued by both the Select Committee and the Senate and House Labor Subcommittees well after petitioner's appearance, all aimed at and culminating in legislation. In this light, petitioner's interrogation emerges as but one step in the process of fact-gathering to establish the necessity for and the nature of remedial legislation, and I cannot say that it was an unnecessary step, or that the record supports a conclusion that the Select Committee questioned petitioner to affect his state trial.

MR. CHIEF JUSTICE WARREN, with whom MR. JUSTICE DOUGLAS joins, dissenting.

This case highlights the problem of defining constitutional limitations upon congressional committees endowed with compulsory process. And because I firmly believe that continued sanction of investigative powers leading to abridgment of individual rights seriously impairs the intent of the Framers of our Bill of Rights, I dissent from MR. JUSTICE HARLAN's treatment of the constitutional issue presented here. That issue may be simply stated: Is it a violation of the constitutional guarantee of due process of law for a legislative committee, under the circumstances of this case, to inquire into matters for which the witness is about to be tried under a pending criminal indictment?

The petitioner, already indicted and awaiting trial in a state court, was subpoenaed to testify before a congressional committee investigating union activity and union funds. When the questioning led to matters concerning facts upon which the state indictment was based,[1] the dilemma the petitioner found facing him was this: if he answered truthfully his answers might aid the pending prosecution;[2] if he answered falsely, he could have been prosecuted for perjury;[3] and, if he relied on the Fifth Amendment's privilege against self-incrimination, that fact could be admitted against him in the state criminal trial.[4] MR. JUSTICE HARLAN's opinion now holds that petitioner's dilemma had a fourth horn; he may also be sent to jail for refusing to choose imposition of one of these penalties. I believe that neither the Constitution nor our past decisions allow Congress to enlist the aid of the federal courts to do to this man what four members of the Court permit.

[1] MR. JUSTICE HARLAN seems to question the relation of the questions asked by the Committee with the subject matter of the state indictment (see pp. 617–618, ante). Of course Congress' concern was whether union funds had been used for an unlawful purpose, whereas the State was concerned with how the funds had been unlawfully used. However, a truthful answer to the question asked by the Committee would a fortiori have answered the State's inquiry if in fact the petitioner had used union funds in violation of state law. As stated by MR. JUSTICE BRENNAN in his concurring opinion (see p. 623, ante): ". . . [T]he congressional inquiry and the state prosecution crossed paths when the Committee learned that union funds might have been used in a corrupt attempt to forestall an earlier indictment in another county . . . for the same alleged [offense]."

[2] Davidson v. State, 205 Ind. 564, 569, 187 N. E. 376, 378.

[3] 18 U. S. C. § 1621.

[4] Crickmore v. State, 213 Ind. 586, 592–593, 12 N. E. 2d 266, 269; State v. Schopmeyer, 207 Ind. 538, 194 N. E. 144. And, by our decisions, such a use by the state court would not be barred. Adamson v. California, 332 U. S. 46; Twining v. New Jersey, 211 U. S. 78.

In 1821 this Court held for the first time in *Anderson* v. *Dunn*, 6 Wheat. 204, that although the Constitution did not expressly grant to Congress the power to conduct investigations, such a power, within legislative competence, could be implied because it is inherent in the lawmaking process. This investigative function of Congress is, of course, entirely independent of the judicial branch of the Government in strict separation-of-power terms. However, Congress, no less than other branches of the Government, is bound to safeguard individual liberties protected by the Bill of Rights, and it is the duty of the courts to insure that the specific guarantees of liberty are preserved for witnesses before a legislative body just as they are guarded for the benefit of defendants in a criminal court trial. This duty cannot be performed nor can the judicial conscience be stilled by a kind of hand-washing statement that a legislative committee (in some instances a committee of a single person delegated with full investigative power) may finally determine for the courts, not only the importance and relevancy of a matter under investigation, but also that the committee has the constitutional power to ask the questions it wants to ask at the moment. A full Court decided in *Kilbourn* v. *Thompson*, 103 U. S. 168, that the courts must ultimately determine who shall be sent to jail and that only the courts may determine whether questions asked by a committee are within Congress' constitutional power of inquiry.[5] And in our more recent cases, "[t]he

[5] 103 U. S. 168, 197:

"If they [the House of Congress] are proceeding in a matter beyond their legitimate cognizance, we are of opinion that this can be shown, and we cannot give our assent to the principle that, by the mere act of asserting a person to be guilty of a contempt, they thereby establish their right to fine and imprison him, beyond the power of any court or any other tribunal whatever to inquire into the grounds on which the order was made. This necessarily grows out of the nature of an

central theme," as we stated in *Watkins* v. *United States,*
354 U. S. 178, 195, has been "the application of the Bill
of Rights as a restraint upon the assertion of govern-
mental power in this form." [6]   This includes *all* provisions
of the Bill of Rights—the Due Process Clause of the Fifth
Amendment, as well as that Amendment's protection
against self-incrimination.

MR. JUSTICE HARLAN's opinion fails to recognize that
the essence of petitioner's contention is that largely
*because of* this Court's decisions in *Hale* v. *Henkel,* 201
U. S. 43, and *United States* v. *Murdock,* 284 U. S. 141, the
interrogation on matters for which he had already been
indicted was a violation of due process.   Cf. *Aiuppa* v.
*United States,* 201 F. 2d 287, 300.   The duty of courts to
safeguard an individual's personal liberty and to protect
him from being compelled to answer questions outside the
constitutional power of Congress, to which I have referred
above, is particularly pertinent when Congress has en-
listed the aid of the federal courts to protect itself against
contumacious conduct and recalcitrant witnesses.   2

authority which can only exist in a limited class of cases, or under
special circumstances; otherwise the limitation is unavailing and the
power omnipotent."

[6] This principle is not a new or novel one.   Again in *Kilbourn,* the
Court made this observation (103 ·U. S., at 190–191):

"It is believed to be one of the chief merits of the American system
of written constitutional law, that all the powers intrusted to govern-
ment, whether state or national, are divided into the three grand
departments, the executive, the legislative, and the judicial.   That
the functions appropriate to each of these branches of government
shall be vested in a separate body of public servants, and that the
perfection of the system requires that the lines which separate and
divide these departments shall be broadly and clearly defined.   It is
also essential to the successful working of this system that the per-
sons intrusted with power in any one of these branches shall not be
permitted to encroach upon the powers confided to the others, but
that each shall by the law of its creation be limited to the exercise
of the powers appropriate to its own department and no other."

U. S. C. § 192. In fulfilling their responsibilities under this statute the courts may not simply assume that every congressional investigation is constitutionally conducted merely because it is shown that great national interests lie in passing needed legislation.[7] To do so would be to abdicate the responsibility placed by the Constitution upon the judiciary to insure that no branch of the Government transgresses constitutional limitations. See *Marbury* v. *Madison,* 1 Cranch 137.

Accommodation of the congressional need for particular information with the individual and national interest in assuring dispassionate protection for witnesses against unconstitutional encroachment upon their individual rights has proved to be an arduous task throughout this Nation's history. One principle, however, formulated to keep congressional power of punishment to compel testimony within the very narrowest of limits, seems to have withstood erosion by the passage of time and the ever-increasing complexities in carrying out the legislative function. That principle is that in exercising its power to compel testimony, Congress must utilize "[t]he least possible power adequate to the end proposed." *Anderson* v. *Dunn,* 6 Wheat. 204, 230–231. And, in *Kilbourn* v. *Thompson, supra,* decided in 1880, this Court had occasion to emphasize the narrowness of this congressional power. In my opinion, the latter case is more like the instant one than any other in our reports and I believe the principles upon which it was decided call for a reversal of the conviction of petitioner here.[8]

---

[7] "The tendency of modern decisions everywhere is to the doctrine that the *jurisdiction* of a court or other tribunal to render a judgment affecting individual rights, is always open to inquiry, when the judgment is relied on in any other proceeding." *Kilbourn* v. *Thompson, supra,* at 197–198. (Emphasis added.)

[8] I am certain that it will come as a great surprise to many to learn that *Kilbourn* has been "severely discredited," as stated in MR. JUSTICE HARLAN's opinion (p. 614, note 16, *ante*), and that it no longer

It is important, I believe, to reiterate the basic concept enunciated there: that it is for the courts, and not for Congress, in insuring to all persons the safeguards of the Bill of Rights, to establish the constitutional standards which must be observed before people in this country can legally be sent to prison. The case arose in this manner: While a United States District Court, pursuant to its competent jurisdiction, was administering the estate of the bankrupt firm of Jay Cook & Company, which owed money to the United States Government, the House of Representatives passed a resolution to investigate a settlement made by the trustee. The basis for this action was that the settlement allegedly would be to the disadvantage of creditors, including the Government, and that the courts were powerless to afford adequate relief

stands to prevent the congressional body of our Government from encroaching upon the exercise of judicial power. The reference to *United States* v. *Rumely,* 345 U. S. 41, 46, where MR. JUSTICE FRANKFURTER indicated in a dictum designed to reserve decision upon a suggested limit of Congress' investigative power, that *Kilbourn* contained "loose language," is hardly the method this Court has chosen to overrule or "discredit" decisions in the past. Indeed, neither have we chosen to do so in footnotes. Moreover, MR. JUSTICE FRANKFURTER's reliance in *Rumely* on *McGrain* v. *Daugherty,* 273 U. S. 135, 170–171, and *Sinclair* v. *United States,* 279 U. S. 263, to support his statement that "substantial inroads" have been made on *Kilbourn* is rather confusing in light of our recent pronouncement in *Watkins* v. *United States,* 354 U. S. 178, 194, that: "In *McGrain* . . . and *Sinclair* . . . , the Court *applied* the precepts of *Kilbourn* to uphold the authority of the Congress to conduct the challenged investigations." (Emphasis added.)

*Kilbourn* has also been cited favorably or without a question of its continued validity in other recent decisions of the Court: *e. g.,* *Barenblatt* v. *United States,* 360 U. S. 109, 133 (opinion by HARLAN, J.); *Tenney* v. *Brandhove,* 341 U. S. 367, 377 (opinion by FRANKFURTER, J.: "This Court has not hesitated to sustain the rights of private individuals when it found Congress was acting outside its legislative role. *Kilbourn* v. *Thompson,* 103 U. S. 168."); *Uphaus* v. *Wyman,* 360 U. S. 72, 84 (dissenting opinion).

because of the settlement. Kilbourn was subpoenaed to appear as a witness and to bring records, papers and maps "pertinent to the question under inquiry." Kilbourn refused and was convicted by the House of contempt. In holding that the House had exceeded its power, a unanimous Court forcefully announced restrictions upon the congressional power to punish for contempt and, at the same time, made it emphatically clear that those restrictions are equally applicable to the congressional power to compel testimony. Thus, when a committee attempts to exercise an extraordinary and unwarranted assumption of judicial power, this Court must strike it down, just as it has done in a situation in which the power to investigate infringed upon powers of law enforcement agencies. Cf. *Quinn* v. *United States,* 349 U. S. 155, 161.

When the circumstances of the instant case are compared to those which prompted the Court to void the conviction in *Kilbourn,* a striking similarity emerges. Indeed, the major difference in the circumstances of the two cases—that is, that this case involves a criminal indictment pending against the witness while *Kilbourn* involved only a civil suit—would seem to make this case even stronger than *Kilbourn.* The Court's chief reliance for holding that Congress exceeded its powers in the *Kilbourn* case was that the transactions into which Congress inquired were pending in a court, that the investigation was one "judicial in its character, and could only be properly and successfully made by. a court of justice"; and, since the inquiry "related to a matter wherein relief or redress could be had only by a judicial proceeding, . . . that the power attempted to be exercised was one confined by the Constitution to the judicial and not to the legislative department of the government." *Kilbourn* v. *Thompson, supra,* at 192–193. The Court summed up its view of the circumstances that showed an absence of congressional power to ask Kilbourn the questions it did with

this statement: "The matter was still pending in a court, and what right had the Congress of the United States to interfere with a suit pending in a court of competent jurisdiction?"

In this case the particular subject of the Committee's inquiry to which the petitioner objected was whether he had in the past been unfaithful to his union in administering its funds. An indictment was then pending against petitioner in a court of competent jurisdiction charging him with using those same funds for an unlawful purpose.[9] The congressional committee, just as the House in *Kilbourn,* had no power to grant the union relief or redress of any kind for that alleged breach of trust by petitioner. So far as Congress was concerned in *Kilbourn,* the differences between Jay Cook and its creditors were held to be their "private affair" about which Congress could not compel a witness to answer; thus, a pending civil case was enough to bar inquiries concerning the transactions in that litigation. There is far more reason, it seems to me, to apply that principle to this case where Congress attempts to compel a witness to supply testimony which could be used to help convict him of a crime.

In so viewing this matter I do not overlook the argument in Mr. Justice Harlan's opinion that this particular testimony was relevant to the congressional investigation of the handling of union funds by their officers in order to help Congress decide if it should enact legis-

---

[9] Contrary to the implication drawn in Mr. Justice Harlan's opinion that the principle to which I would adhere in the instant case would also apply "to inquiries calling for answers that might be used to the prejudice of the witness in any *future* judicial proceeding" (p. 613, note 16, *ante*), it seems obvious that nothing in this opinion gives support to such an inference. In fact, I believe a careful reading of it would make clear that it is specifically because of the *pending* nature of the state indictment that due process has been violated by this inquiry.

lation in this field, and, if so, what kind of legislation it should enact. Conceding that under *Anderson* and *Kilbourn* the Committee here had the power to ask general questions along this line, it does not follow that it could make detailed inquiries about the conduct of a witness that related specifically to a crime with which he was already charged and for which he was soon to be tried in a court of competent jurisdiction.[10] Not only would it be contrary to the holding in *Kilbourn* to conclude otherwise, but it is incomprehensible to me how it can be urged that Congress needed the details of how petitioner committed this alleged crime in order to pass general legislation about union funds. It would be hard, indeed, I believe, to make rational proof that to refuse to Congress the power to compel testimony from a witness about a matter for which he is about to be tried criminally, would invade the area of "[t]he least possible power adequate" to enable Congress to legislate about union officers and union funds.

In my view, it is not a satisfactory approach to problems involving principles of constitutional dimension to look first to the interests of the Government and, if they loom large in the particular instance, to go no further. The countervailing principles embodied in our Bill of Rights do not demand attention only when the governmental interest lacks compulsion. The Bill of Rights demands much more than that. In judging whether Congress has used "[t]he least possible power adequate to the end proposed," the courts must assure that any possible infringement on personal rights be minimized. In this determination the courts must consider factors such as the degree of need of the investigating committee for

---

[10] The State's delay subsequent to the Committee's investigation in bringing the petitioner to trial seems hardly relevant to our inquiry. The speed with which the State's judicial process moves cannot justify an otherwise unconstitutional exercise of federal legislative power.

the particular information requested and whether the Committee is able to get the desired information from some evidentiary source other than from a witness presently under criminal indictment on a charge relating to those very facts. The fact that in this case Indiana appears to have had sufficient evidence to secure an indictment against the petitioner is adequate indication that independent sources of information were easily available to the Committee by which it could have obtained the very information it sought here without jeopardizing the constitutional rights of the petitioner by asking him about it. Moreover, it cannot be argued with persuasion that Congress would be met with an insurmountable barrier in gathering needed information if a defendant in a pending criminal trial could not be compelled to answer questions before a legislative committee relevant to that indictment. Congress has shown that it has at its command means for removing any such barrier. See *Adams v. Maryland,* 347 U. S. 179.

The process through which the result has been reached in Mr. Justice Harlan's opinion seems to me to ignore the very reasons the Bill of Rights was incorporated into our Constitution. Those provisions were adopted as, and are intended to be, restraints upon actions by the Government which trespass upon personal liberties reserved to the individual in our society. If, as I believe, the Constitution has barred the Government from proceeding in a particular instance, despite the conceded validity of its interest in the testimony, the courts are duty bound to stand fast against any impairment of the individual's guaranteed rights. Congress cannot, by imposing upon the courts the responsibility for committing persons to jail for contempt of its committees, expect or require the courts to apply lower standards than are compelled by the Bill of Rights, any more than it could direct the courts to suppress those same rights in judicial proceedings. The

Bill of Rights, not Congress, establishes the standards which must be observed before people in this country may legally be sent to jail. A congressional committee has the power to compel testimony to aid it in shaping legislation, but it does not have the power merely to publicize a citizen's shortcomings or to aid a State in convicting him of crime. I consider a procedure which pinions a citizen within a dilemma such as was created by the circumstances of this case, and which goes beyond "[t]he least possible power" adequate to accomplish Congress' constitutionally permissible ends, a direct encroachment upon rights secured by due process of law. To send this man to jail for his refusal to answer questions that, because of the circumstances of this case, are outside the power of a committee to ask is, as *Kilbourn* v. *Thompson* held, a plain denial of that process guaranteed by the Fifth Amendment to our Federal Constitution. I would reverse the conviction.

Mr. Justice Douglas, dissenting.

I agree with the Court that the questions asked petitioner by the Committee were within its competence and were pertinent to the legislative inquiry. I do not think, however, that under the circumstances disclosed, the federal courts should lend a hand in fining him or in sending him off to prison.

Four months before these hearings, petitioner had been indicted in an Indiana court for felonies that involved directly or indirectly the matters concerning which the Committee questioned him. If he had refused to answer because of the Self-Incrimination Clause of the Fifth Amendment, his plea would have been admissible in the Indiana prosecution. *State* v. *Schopmeyer,* 207 Ind. 538, 542–543, 194 N. E. 144, 146. And by our decisions (see *Adamson* v. *California,* 332 U. S. 46) such a use would not

be barred. So, under advice of counsel, petitioner did not refuse to answer on the ground of self-incrimination. Rather, he refused to answer on the ground that the questions might "aid the prosecution in the case in which I am under indictment and thus be in denial of due process of law."

The power to hold in contempt a witness who refuses to testify before a congressional committee has a dual aspect. First is the power of either the House or the Senate to summon him and order him held in custody until he agrees to testify. This power, though not used in recent years (*Watkins* v. *United States,* 354 U. S. 178, 206), is of an ancient vintage.[1] But the power of either House to imprison the witness expires at the end of the session. As stated in *Anderson* v. *Dunn,* 6 Wheat. 204, 231, ". . . although the legislative power continues perpetual, the legislative body ceases to exist on the moment of its adjournment or periodical dissolution. It follows, that imprisonment must terminate with that adjournment."

Second is the power of the courts to punish witnesses who are recalcitrant or defiant before a congressional committee or who, when summoned, default. 2 U. S. C. § 192. This law, enacted in 1857, was passed so that "a greater punishment" than the Congress thought it had the power to impose could be inflicted. *Watkins* v. *United States, supra,* 207, n. 45.

---

[1] As stated in *Stockdale* v. *Hansard,* [1839] 9 A. & E. 1, 114:

"The privilege of committing for contempt is inherent in every deliberative body invested with authority by the constitution. But, however flagrant the contempt, the House of Commons can only commit till the close of the existing session. Their privilege to commit is not better known than this limitation of it. Though the party should deserve the severest penalties, yet, his offence being committed the day before a prorogation, if the house ordered his imprisonment but for a week, every court in Westminster Hall and every judge of all the courts would be bound to discharge him by habeas corpus."

We deal here with the second of these powers.

The federal courts do not sit as push-button mechanisms to fine or imprison those whom Congress refers to the United States Attorney for prosecution.

There is, for example, the case where no quorum of the congressional committee is present when the witness is charged with contempt. As said in *Christoffel* v. *United States*, 338 U. S. 84, 90, "This not only seems to us contrary to the rules and practice of the Congress but *denies petitioner a fundamental right.* That right is that he be convicted of crime only on proof of all the elements of the crime charged against him. A tribunal that is not competent is no tribunal, and it is unthinkable that such a body can be the instrument of criminal conviction." (Italics supplied.)

We held in *Slagle* v. *Ohio*, 366 U. S. 259, 265–266, that though a legislative committee acts within bounds, yet the form of questions asked and rulings on objections to them may be so obtuse as to make it violative of due process for courts to punish a refusal to answer.[2] Cf. *Quinn* v. *United States*, 349 U. S. 155, 167–168.

A court will not lend its hand to inflict punishment on a person for contempt of a congressional committee where the proceeding was *fundamentally unfair.*[3] The proceed-

---

[2] *Sinclair* v. *United States*, 279 U. S. 263, is not opposed to this view. For there the pending suit was civil, not criminal, and the defense was that the congressional committee had exhausted its power to investigate, *id.*, 290, not that it would violate due process for the federal courts to become implicated in a criminal prosecution.

[3] MR. JUSTICE FRANKFURTER expressed the idea in his separate opinion in *Watkins* v. *United States, supra:*

"By . . . making the federal judiciary the affirmative agency for enforcing the authority that underlies the congressional power to punish for contempt, Congress necessarily brings into play the specific provisions of the Constitution relating to the prosecution of offenses and those implied restrictions under which courts function." *Id.*, at 216.

ing was held unfair in *Watkins* v. *United States, supra,* because it was far from clear that the questions asked by the Committee were "pertinent" to the question under inquiry. *Id.*, 204–214. "Fundamental fairness," we said, demands that the witness be informed "what the topic under inquiry is and the connective reasoning whereby the precise questions asked relate to it." *Id.*, at 215. Vagueness in investigatory inquiries, like vagueness in criminal statutes, may not give a witness the notice that is necessary under our standards of due process. *Id.*, at 208.

There is, I submit, a fundamental unfairness when we make it impossible for a witness to invoke a privilege which the Constitution grants him, and then send him off to jail when the privilege we withhold would have protected him. The guarantee against self-incrimination would have given petitioner full and complete immunity but for our decisions in cases like *Adamson* v. *California, supra,* and *Cohen* v. *Hurley,* 366 U. S. 117. Those decisions, however, make his plea of self-incrimination admissible in the pending prosecution in the Indiana court. When we say that the Self-Incrimination Clause of the Fifth Amendment is not applicable to the States by reason of the Fourteenth Amendment, we turn a federal proceeding into a pretrial of the state prosecution, should the witness invoke his constitutional right. Since he dare not invoke it for fear of going to a state prison, he ends up in a federal prison. The result is to turn the guarantee against self-incrimination into a sham. A witness is whipsawed between state and federal agencies, having no way to escape the federal prison unless he confesses himself into a state prison.

We have at times said that this Hobson's choice granted a witness is a product of federalism. *Feldman* v. *United States,* 322 U. S. 487, 493, was, indeed, a case where the testimony of a man compelled to testify in a state pro-

ceeding sent him to a federal prison. But the result of this line of cases is a needless consequence of federalism, and one that makes the constitutional privilege against self-incrimination a "phrase without reality." *Cohen* v. *Hurley, supra,* at 132 (dissenting opinion). Why due process for the States should be different in this respect from due process for the Federal Government is a mystery. We should overrule *Adamson* v. *California, supra,* and hold that no admission made by a witness in a federal proceeding nor any refusal to testify can be used against him in a state prosecution. Until we take that course, we cannot in good conscience send a man to a federal prison who goes there solely because we deprived him of a basic constitutional guarantee.

What we do today is consistent with our prior decisions in *Hale* v. *Henkel,* 201 U. S. 43; *United States* v. *Murdock,* 284 U. S. 141. Yet the result is unfair. This case, like its forebears, shows why we should rid the books of *Adamson* v. *California, supra,* and hold that the privilege against self-incrimination contained in the Fifth Amendment is applicable to the States and to the Federal Government alike.

There has never, in my view, been a satisfactory answer to the position of the first Justice Harlan that due process in the Fourteenth Amendment does not mean something different from due process in the Fifth Amendment. See *Hurtado* v. *California,* 110 U. S. 516, 541 *et seq.*